IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Rogelio Carlos, III, and | § | |
| Myrna Carlos, | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | SA-16-CV-0251-FB |
| | § | |
| Carlos Chavez, Virgilio Gonzalez, | § | |
| James Ybarra, Mark Delgado, | § | |
| City of San Antonio, San Antonio | § | |
| Police Department, and Detective John | § | |
| Doe, et al. | § | |
| *Defendants* | § | |

## PLAINTIFFS' THIRD AMENDED ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs, Rogelio Carlos, III and Myrna Carlos (hereinafter "Plaintiffs"), file this their Third Amended Original Complaint and in support respectfully shows the Court as follows:

## I.    INTRODUCTION

1.    This is a civil rights action brought pursuant to 42 U.S.C. § 1983 arising from an unlawful arrest that occurred in San Antonio, Texas on May 20, 2014. The arrest was one that was predicated on no reasonable belief that Plaintiff, Rogelio Carlos, III, had acted in anyway unlawful and no particularized facts to establish probable cause. Plaintiffs are seeking damages against Defendants, City of San Antonio, San Antonio Police Department, San Antonio Police Officer Virgilio Gonzalez, San Antonio Police Officer Carlos Chavez, San Antonio Police Officer James Ybarra, San Antonio Police Officer Mark Delgado and Detective John Doe in their individual capacities, for

committing acts under color of law, which deprived Plaintiff, of Plaintiff's rights secured under the Constitution and Laws of the United States.

Plaintiffs also seek damages against an unnamed San Antonio Police Detective whose name was redacted for identity protection purposes and will be listed as Detective "John Doe."

## II.     PARTIES

2.     Plaintiffs, **Rogelio Carlos, III** ("Carlos") and **Myrna Carlos**, are residents of Bexar County, Texas.

3.     San Antonio Police Officer, **Carlos Chavez**, is a police officer with the City of San Antonio. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Chavez has been served and entered an appearance in this case.

4.     San Antonio Police Officer, **Virgilio Gonzalez**, is a police officer with the City of San Antonio. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Gonzalez has been served and entered an appearance in this case.

5.     San Antonio Police Officer, **Mark Delgado**, is a police officer with the City of San Antonio. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Delgado has been served and entered an appearance in this case.

6.     San Antonio Police Officer Detective, **John Doe**, is a Detective with the City of San Antonio. He acted under the color of law of the statutes, ordinances, regulations,

policies, customs, and usages of the State of Texas. Defendant John Doe has been served and entered an appearance in this case.

7.       San Antonio Police Officer, **James Ybarra**, is a police officer with the City of San Antonio. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Ybarra has been served and entered an appearance in this case.

8.       **City of San Antonio** ("the City") is a municipality organized under the laws of the State of Texas which, as a home-rule municipality and the City's Charter, Art. V, §50(3), has created a policy department, the San Antonio Police Department ("SAPD") through which the City is responsible for the implementation of SAPD policies, procedures, practices and customs, as well as the acts and omissions of its police officers, including all of the police officers and detectives named above. The City has also been served and entered its appearance in this case.

9.       **National Neuromonitoring Services, LLC**, is a neuromonitoring company doing business in the state of Texas, which may be served with citation by serving their registered agent, William W. Meier, III, 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202, or wherever he may be found.

10.      **Neurodiagnostics and Neuromonitoring Institute, Inc.**, is a neuromonitoring company doing business in the state of Texas, which may be served with citation by serving their registered agent, William W. Meier, III, 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202, or wherever he may be found.

11.      **South Texas Neuromonitoring**, is a neuromonitoring company doing business

in the state of Texas, which may be served with citation by serving their registered agent, William W. Meier, III, 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202, or wherever he may be found.

12.     **William VanNess, M.D.** is a physician employee of National Neuromonitoring Services, LLC, rendering services in San Antonio and in the State of Texas, and who may be served with citation at 106 Breakwater Court, Mooresville, NC 28117-6036, or wherever he may be found.

13.     **Maribel Gomez, CNIM**, is a neuromonitoring technician rendering services in San Antonio and the State of Texas, who may be served with citation at 1141 N Loop 1604 E, Suite 105-612, San Antonio, Texas 78232, or wherever she may be found.

### III.     JURISDICTION

14.     Because this action is brought pursuant to 42 U.S.C. § 1983 and 1988, this Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331, as this lawsuit arises under the Constitution, laws, or treaties of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims as these claims are related to the Plaintiff's federal claims as to form of the same case or controversy under Article II of the U.S. Constitution.

### IV.     VENUE

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## V.    FACTUAL BACKGROUND

16.    On May 20, 2014, Plaintiff, Rogelio Carlos, III, was lawfully on the property located at Westover Hills and Rodgers Road in San Antonio Bexar County, Texas where his wife and sister in law were in the process of erecting a building for the purpose of starting a pediatric medical clinic. The building was under construction at the time of the incident which is the basis of this suit.

17.    All of a sudden, without warning, Detective John Doe and members of the San Antonio Special Weapons and Tactics Division (SWAT), Chavez and Gonzalez rushed Plaintiff and as he was complying with their requests to get on the ground, the officers began punching Plaintiff with their fists and kicking Plaintiff about the head and the body. Plaintiff begged the Defendants to stop beating Plaintiff however the Defendants continued to strike Plaintiff violently about the face, neck, and body yelling "where's the gun?" to which Plaintiff replied "I don't have a gun, this is my property, this is my property."

18.    It is undisputed that the Defendants struck and punched Plaintiff several times during the assault and placed the Plaintiff in handcuffs. At no time did any of the officers ask Plaintiff to identify himself through a photo identification, cell phone or otherwise. After Plaintiff was placed in handcuffs and required to lay face down in the dirt, one of the Defendants began going through the Plaintiff's cell phone. At no time did any of the Defendants advise Plaintiff of why Plaintiff was so violently detained and what the arrest was for despite Plaintiff's continued pleas for a reason for the violent detention.

19.     At some point, after Plaintiff was violently assaulted, the Defendants realized that Plaintiff had in fact committed no crime nor was there any reason to detain or arrest Plaintiff nor was there a reasonable belief on the part of the Defendants that Plaintiff had committed a crime or was in the process of committing a crime or that Plaintiff was a suspect in any criminal act nor was there any probable cause on the part of Defendants to believe Plaintiff had committed a crime.

## SPECIFIC FACTUAL ALLEGATIONS

20.     Detective John Doe is a detective with the SAPD and was working the HIDTA Narcotics Unit in an undercover capacity on May 20, 2014. Detective John Doe was driving an unmarked police vehicle issued to Detective John Doe equipped with an onboard computer and a radio.

21.     Defendant Detective John Doe was in pursuit of an alleged perpetrator by the name of Josue Gonzalez-Rodriguez. It was alleged that AP Gonzalez-Rodriguez had been engaged in criminal activity and Detective John Doe enlisted the services of Defendant Ybarra to assist in the traffic stop of AP Gonzalez-Rodriguez.

22.     It is undisputed that Defendant Ybarra got behind the AP Gonzalez-Rodriguez and had a visual on the vehicle that AP Gonzalez-Rodriguez was driving. At some point after a pursuit between Defendant Ybarra and AP Gonzalez-Rodriguez, AP Gonzalez-Rodriguez abandoned his vehicle someplace near the Rudy's Bar-B-Q off of highway 151. At that time Defendant Ybarra had a visual on AP Gonzalez-Rodriguez as AP Gonzalez-Rodriguez fled into a nearby wooded area.

23.     The only description provided by Defendant Ybarra broadcast over the radio to

the other police officers was a clothing description.

24.    In response to the broadcast by Defendant Ybarra, Defendant Detective John Doe radioed that Detective John Doe had a person in his sight that matched the clothing description.

25.    Defendant M. Delgado joined in the pursuit of the alleged perpetrator and was also able to visualize the alleged perpetrator.

## THE INCIDENT

26.    At approximately 2:00 p.m. on May 20, 2014, Defendant Officers Ybarra, Chavez, Gonzalez, and Detective John Doe with the SAPD brutally assaulted Plaintiff, Rogelio Carlos, without probable cause or reasonable belief that Plaintiff had committed any crime.

27.    The statement of the Defendants confirm that Plaintiff, Rogelio Carlos, III, was misidentified as an alleged perpetrator that the Defendants were attempting to apprehend when in fact Plaintiff neither matched the description of the alleged perpetrator, nor was Plaintiff acting in any manner that would cause the Defendants to arrest and assault Plaintiff.

28.    After Plaintiff had been brutally assaulted, it was determined by Defendants that Defendants had the wrong person. None of the Defendants involved in the assault apologized or even acknowledged Plaintiff as being the wrong person.

29.    At all times relevant to the incident assault, Plaintiff was compliant and cooperative with all Defendants. According to the police statements, none of the Defendants received any injuries, bruises or marks on their body.

## INVESTIGATION

30.     Defendant Detective John Doe is a detective with the HIDTA undercover with the SAPD. Detective John Doe was acting on a felony assault family violence 2 warrant to arrest the alleged perpetrator which was not the Plaintiff.

31.     Defendant Chavez, Delgado, and are SWAT officers and were called in to assist Detective John Doe in the apprehension of the alleged perpetrator Gonzalez-Rodriguez.

32.     Officer Ybarra is a San Antonio Police Officer assigned to patrol who was called in to assist in the apprehension of the alleged perpetrator Gonzalez-Rodriguez which was not the Plaintiff by Detective John Doe.

33.     Sergeant Larry Blackburn is an Internal Affairs Investigator with the San Antonio Police Department who initiated the Internal Affairs Investigation in this case. Defendants, Ybarra, John Doe, Chavez, Delgado, Gonzalez and Plaintiff were all interviewed.

34.     Throughout the interviews, a common theme became evident – the Defendants had detained and assaulted an innocent person. The Defendants had failed in their communication with one another and had misused the radio system and protocol procedures of the SAPD. At no time did the Defendants read Plaintiff his Miranda Rights nor did any of the Defendants indicate that Plaintiff acted in any manner that caused Defendants to fear for their lives at the time of the incident.

35.     Lt. Timothy Vaughn is the Internal Affairs Unit Director who signed off on the Internal Affairs Investigation.

36.     Captain James Flavin is the Internal Affairs Commander who signed off on the

Internal Affairs Investigation.

**DEFENDANTS' DECISION TO ARREST**

37.     The decision to arrest Plaintiff was initiated by a lack of proper radio and communication protocol in the identification of an alleged perpetrator by Defendants. The decision was made arbitrarily and capriciously without any reasonable suspicion or probable cause to believe Plaintiff was an alleged perpetrator or was in the commission of a crime.

38.     The lack of communication between the Defendants and failure to verify the identification of Plaintiff was a decision made at the time of arrest by the Defendants.

39.     At no time did any of the Defendants ask the Plaintiff to identify himself.

40.     At no time did any of the Defendants attempt to compare the description of the alleged perpetrator with that of the Plaintiff.

41.     The height, weight and age of the alleged perpetrator and Plaintiff were completely ignored by the Defendants.

42.     Defendants lacked reasonable suspicion, probable cause or any evidence that Plaintiff was or had engaged in criminal conduct.

**VI.    FACTS PERTAINING TO PLAINTIFF**

43.     Plaintiff, Rogelio Carlos, III, is a 43 year old married man with a loving wife and three beautiful children.

44.     Plaintiff grew up in El Paso, Texas.

45.     Plaintiff was employed with American Airlines for 18 years.

46.     Plaintiff was engaged in completely lawful conduct at all times relevant to his

violent detention and assault by Defendants.

47.    Plaintiff is a resident of Bexar County, San Antonio Texas.

48.    Plaintiff had not engaged in any criminal activity on the day of the incident which would lead any police officer, agency, or the City to have reasonable suspicion or probable cause to assault Plaintiff.

49.    Plaintiff was completely compliant with all requests by the police officers despite the police officers assault.

50.    Plaintiff's attendance on the property that he owned on May 20, 2014, was lawful and did not violate any laws of the State of Texas or the United States.

51.    Plaintiff did not hit, strike, punch, resist or threaten any person on May 20, 2014.

52.    The entire basis of Defendants' belief that probable cause existed to arrest and assault Plaintiff comes down to his presence at his property on May 20, 2014 wearing a white t-shirt.

53.    No probable cause affidavit was sworn out for Plaintiff at any time incident to the arrest and assault.

54.    Plaintiff's cell phone was examined at the scene by law enforcement and contains no evidence of any illegal plan or desire to engage in illegal conduct before, during, or after May 20, 2014.

## VII.    CAUSES OF ACTION

### 42 U.S.C. § 1983 – 4th Amendment Violation

55.    Paragraphs 1-49 are incorporated herein by reference.

56.    Plaintiff had a clearly established Constitutional right to be free from unlawful

arrest. As a direct result of Defendants' conduct, Plaintiff was falsely arrested and assaulted incident thereto despite the absence of probable cause to establish that Plaintiff had committed a crime. Defendants' conduct, as described above, deprived Plaintiff of his right to be secure in his person against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

57.    The Fourth Amendment of the U.S. Constitution states,

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, **and no warrants shall issue, but upon probable cause**, supported by oath or affirmation, and **particularly describing** the place to be searched, and the persons or things to be seized.

(emphasis added).   As the Supreme Court of the United States has plainly stated, **"[w]here the standard is probable cause, a... seizure of a person must be supported by probable cause particularized with respect to that person."** *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasis added).[1]

58.    Plaintiff pleads that Defendants Chavez, Gonzalez, and Detective John Doe knowingly and intentionally, or with reckless disregard for the truth, caused Plaintiff to be assaulted by not verifying Plaintiff's identification nor establishing that Plaintiff was

---

[1] *See also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("...**the belief of guilt must be particularized with respect to the person to be searched or seized**."); *Trapper v. North Carolina*, 451 U.S. 997, 1000 (1981); *Michigan v. Summers*, 452 U.S. 692, 695, n. 4 (1981); *U.S. v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008); *Williams v. Kaufman Co.*, 352 F.3d 994, 1003 (5th Cir. 2003) (quoting Ybarra, 444 U.S. at 91); *Merchant v. Bauer*, 677 F.3d 656, 666 (4th Cir. 2012) ("The Supreme Court has emphasized that '[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.'"); *Hawkins v. Mitchell*, et al, 983, 994 (7th Cir. 2014); *U.S. v. Ojeda-Ramos*, 455 F.3d 1178, 1181 (10th Cir. 2006) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Guzman*, SA-13-CR-89-DAE (W.D. Tex. 2013); *Dinler v. City of New York*, 2012 WL 4513352 *6 (S.D.N.Y 2012) ("The Fourth Amendment does not recognize guilty by association.").

indeed a suspicious person. Even assuming that Defendants Chavez, Gonzalez, and Detective John Doe were acting on information provided by Defendant Ybarra, such information was false and made intentionally or with reckless disregard.

59.    Further, Defendants Chavez, Gonzalez, and Detective John Doe are liable to Plaintiff because they knowingly and intentionally, or with reckless disregard for the truth, brutally assaulted Plaintiff without any reasonable suspicion that a crime had been committed or that Plaintiff was actually engaging in a crime. It is not illegal to wear a white t-shirt.

60.    As set forth in *Malley v. Briggs*, 475 U.S. 335 (1986), and its progeny, the Plaintiff's Fourth Amendment rights were violated when no probable cause or reasonable suspicion existed for the apprehension and assault of Plaintiff for simply wearing a white t-shirt.

## 42 U.S.C. § 1983 – 4th Amendment Violation

61.    Paragraphs 1-55 are incorporated herein by reference.

62.    In the alternative, Plaintiff pleads civil liability against Defendants based on a "Franks" violation. *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *see also Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990). Defendants, Officer Virgilio Gonzalez, Officer Carlos Chavez, Officer James Ybarra, Officer Mark Delgado and Detective John Doe, knowingly and intentionally, or with reckless disregard for the truth, assaulted Plaintiff without reasonable suspicion or probable cause and in violation of Procedure 501 of the San Antonio Police Department protocol for use of excessive force.

63.     Defendants' statements all admit that they arrested and assaulted the wrong person under the guise of a misidentification.

64.     No probable cause affidavit was sworn out for Rogelio Carlos III and thus the Defendants had no reason to detain or question Plaintiff.

65.     Further, Defendants, Officer Virgilio Gonzalez, Officer Carlos Chavez, Officer James Ybarra, Officer Mark Delgado, and Detective John Doe used their communications devices in violation of SAPD policy and procedure in identifying and characterizing the alleged perpetrator who was not Plaintiff resulting in Plaintiff being brutally assaulted.

## 42 U.S.C. § 1983 – 14th Amendment Violation

66.     Paragraphs 1-60 are incorporated herein by reference.

67.     If it is determined that a Fourth Amendment violation is not sustainable, Plaintiff alternatively asserts a violation of his Due Process rights under the Fourteenth Amendment to be free from unlawful arrest as a result of false and misleading statements that were knowingly, or with reckless disregard included in the communication between the police officers. When Defendants radioed that they had the suspect, Plaintiff, Roger Carlos, III, that was false and misleading and caused the arrest and assault to occur. The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression.

68.     Specifically, Plaintiff has rights guaranteed by the Fourteenth Amendment not to have law enforcement deliberately fabricate evidence, including the insertion of facts in

radio communications and that Defendants know to be false which resulted in the brutal assault of Plaintiff.

69.    Here, Defendants knew there was no basis for the claim that Plaintiff was a suspect that had committed a crime. By arresting Plaintiff and assaulting Plaintiff, Defendants violated Plaintiff's Fourteenth Amendment rights. This is conduct sufficient to shock the conscience for substantive due process purposes.

## 42 U.S.C. § 1983 – Conspiracy

70.    Paragraphs 1-64 are incorporated herein by reference.

71.    In the moments immediately preceding the incident, Defendants Ybarra, Chavez, Gonzalez, Delgado, and Doe entered into a conspiracy to deprive Plaintiff of his right to be free from unlawful seizure in violation of his Fourth Amendment rights.  Defendants acted in concert either to orchestrate or to carry out the illegal seizure and cause the illegal arrest described in this Complaint when they knew there was no probable cause or reasonable suspicion to arrest Plaintiff. Defendants are liable to Plaintiff for their violations of the Fourth Amendment under 42 U.S.C. § 1983.

## OFFICIAL POLICY OR CUSTOM
## AGAINST THE CITY BY AND THROUGH THE SAPD

72.    Plaintiff incorporates paragraphs 1-66 as set forth.

73.    Defendant the City, by and through the SAPD, is liable under 42 U.S.C. § 1983 because the deprivation of Rogelio Carlos, III's constitutional rights resulted from one or more official policies or customs of Defendants, CITY OF SAN ANTONIO and SAN ANTONIO POLICE DEPARTMENT. Specifically, the policies or customs involved

include, but are not limited to, any and all policies or customs instructing or allowing officers to identify citizens, make stops, searches, investigative detentions and arrests without possessing, or having training or instruction to use, less than lethal control devices and tactics. Defendant the City, by and through SAPD's policies and procedures for the use of communication devices and radios during the pursuit of a suspect in and of themselves on their face are unconstitutional or establish a custom of behavior by the City that lend themselves to the very type of conduct for which Plaintiff now complains.

74.     The official policies or customs of the City, by and through the SAPD, were a moving force and were a direct cause- in-fact of the deprivation of constitutional rights, as well as serious injuries sustained by Plaintiff. The official policies or customs of the City, by and through the SAPD, were likewise the proximate cause of Plaintiff's deprivation of constitutional rights, as well as of his injuries sustained. The policies or customs reflect deliberate indifference to the risk that members of the public will be subject to unreasonable search and seizure and excessive force, in violation of their Fourth Amendment right to be free from unreasonable search and seizure, and to the risk that members of the public will as a result suffer severe personal injuries and death.

75.     The City, by and through the SAPD, ratified, after the fact, the acts and/or omissions at issue of Officer Virgilio Gonzalez, Officer Carlos Chavez, Officer James Ybarra, Officer Mark Delgado and Detective John Doe, which further evidences that the City's policies or customs were the moving force behind the deprivations of Rogelio Carlos, III's Fourth Amendment right to be free from unreasonable search and seizure and excessive force.

76.    These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation or discovery.

## INADEQUATE TRAINING AND SUPERVISION
## AGAINST THE CITY, BY AND THROUGH THE SAPD

77.    Plaintiff incorporates paragraphs 1-71 and incorporated by reference, as if fully set forth herein.

78.    Defendant the City, by and through the SAPD, is liable under 42 U.S.C. § 1983 because: (1) its training and supervision relating to identification of citizens, stops, searches, investigative detentions and arrests are inadequate; (2) its training and supervision relating to identifying citizens and the use of deadly force are inadequate; (3) its training and supervision relating to the use of less than lethal control devices and tactics are inadequate; (4) it was deliberately indifferent to the safety and the constitutional rights of the public in adopting training and supervision policies and customs; and (5) the inadequate training and supervision directly and proximately caused the Plaintiffs' damages.

79.    These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation or discovery.

## VIII.   FACTS PERTAINING TO NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., SOUTH TEXAS NEUROMONITORING, MARIBEL GOMEZ, AND DR. WILLIAM VANNESS

80.    After the alleged assault occurred to Plaintiff Roger Carlos, Roger Carlos began seeing medical providers for treatment of his injuries. On or about April 10, 2015, Roger Carlos began treating with Dr. Adam Bruggeman. Dr. Adam Bruggeman was an

orthopedic surgeon licensed to practice medicine in the State of Texas with his licensure appropriately on file with the State of Texas.  At the time of the initial consultation with Dr. Bruggeman, Roger Carlos complained of numbness in his hands and generalized tenderness throughout Roger Carlos' neck.  Previous to the consultation with Dr. Bruggeman, Roger Carlos had undergone cervical epidural steroid injections. An MRI was performed on Roger Carlos on or about July 29, 2014. The MRI revealed an annular tear at level C3-C4 of the cervical vertebrae of Roger Carlos.  The MRI further revealed that at C4-C5, Roger Carlos had a disc protrusion in addition to the annular tear that had pushed toward the spinal cord.  The MRI also revealed that Roger Carlos had a C5-C6 disc protrusion with fairly significant amount of disc material and the disc material was indenting or pressing on the spinal cord.  The MRI also showed a disc protrusion at C6-C7 which was flattening the anterior spinal cord.

81.    Dr. Bruggeman diagnosed Roger Carlos with cervical disc herniations at multiple levels pressing on the spinal cord.

82.    On or about September 11, 2015 the decision was made between Dr. Bruggeman and Roger Carlos for Roger to undergo surgery on his neck.  Dr. Bruggeman discussed the risks and benefits of the surgery with Roger Carlos including but not limited to blood loss, paralysis, and death.

83.    On or about November 3, 2015 Dr. Adam Bruggeman performed an Anterior cervical diskectomy and fusion C5-C6, Anterior diskectomy and fusion C6-C7, Anterior instrumentation C5-C7, Placement of intervertebral device C5-C6, Placement of intervertebral device C6-C7, Bone marrow aspirate through separate fascial incision

with intraoperative neuromonitoring.

84.    During the surgery of November 3, 2015 there was a neuromonitoring company that was responsible for monitoring the nerve impulses of Roger Carlos as well as Roger Carlos' neuro status during the surgery. The purpose of the neuromonitoring was to determine whether Roger Carlos was maintaining normal neurological status of extremities during the procedure of November 3, 2015.   The neuromonitoring company was    Defendants    NATIONAL    NEUROMONITORING    SERVICES    L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING, that was supplying the neuromonitoring for Roger Carlos on November 3, 2015.   The technician who was employed by Defendants, NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING    INSTITUTE,    INC.,    AND    SOUTH    TEXAS NEUROMONITORING and who was responsible for being in the operating room and communicating the neuromonitoring status of Roger Carlos on November 3, 2015 was Defendant MARIBEL GOMEZ. The neurologist who was responsible for monitoring Roger Carlos during the cervical surgery on November 3, 2015 was Defendant WILLIAM VANNESS M.D.

85.    The neuromonitoring for Roger Carlos by Defendants NATIONAL NEUROMONITORING    SERVICES    L.L.C.,    NEURODIAGNOSTICS    AND NEUROMONITORING INSTITUTE, INC., SOUTH TEXAS NEUROMONITORING, MARIBEL GOMEZ, AND DR. WILLIAM VANNESS began at or about 5:20 p.m. (CST) on November 3, 2015. The type of neuromonitoring that was going to be used was

Electromyography (EMG's) and Somatosensory Evoked Potentials (SSEP's). Motor Evoked Potentials (MEPs) were not used for Roger Carlos' surgery.

86.    During the cervical procedure of November 3, 2015, and more specifically during the placement of the hardware by Dr. Bruggeman at the cervical level, the intraoperative monitoring was remarkable for significant changes on the bilateral posterior tibial nerve SSEPs and EMG activity.

### XIX.    NEGLIGENCE AND GROSS NEGLIGENCE OF NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., SOUTH TEXAS NEUROMONITORING, MARIBEL GOMEZ CNIM AND DR. WILLIAM VANNESS M.D.

87.    At all times relevant to the surgery of November 3, 2015 on Roger Carlos, MARIBEL GOMEZ AND DR. WILLIAM VANNESS were employees of NATIONAL NEUROMONITORING SERVICES L.L.C. and or NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING and as such were acting under the course and scope of their employment with NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING and as such all acts or omissions of negligence or gross negligence on the part of MARIBEL GOMEZ AND DR. WILLIAM VANNESS are attributable to NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING. Further, Defendants, MARIBEL GOMEZ, DR. WILLIAM VANNESS and NATIONAL NEUROMONITORING SERVICES L.L.C.,

NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING along with other Defendants named in this complaint are joint and severally liable for the injuries to Roger Carlos.

88.    DR. WILLIAM VANNESS was the on-line supervising and interpreting neurologist assigned to Roger Carlos' case on November 3, 2015. DR. VANNESS was charged with the task of supervising and interpreting critical changes in the wave forms during the surgery.    MARIBEL GOMEZ, CNIM, was a certified neuromonitoring technician in the operating room who performed the technical functions of preparing the equipment and preparing the patient with the placement of electrodes in order for the neuromonitoring to be performed during the surgery.  DR. VANNESS breached the applicable standard of care for a neurologist monitoring patients during cervical surgery and failed to perform as a reasonable and prudent physician under the same or similar circumstances monitoring a patient during a cervical surgery would perform during Roger Carlos' surgery of November 3, 2015 in the following particulars;

A.    In failing to assess and to monitor Roger Carlos neurological function during the surgery of November 3, 2015.

B.    In failing to identify the baseline tracing and comparing this tracing to the loss of tracing of the left posterior tibial nerve.

C.    In failing to identify the abnormal tracing that existed during the surgery from the left posterior tibial nerve.

D.    In failing to identify the latency of the tracing that existed during the surgery of the left posterior tibial nerve.

E.     In failing to identify the baseline tracing and comparing this tracing to the loss of tracing of the right posterior tibial nerve.

F.     In failing to identify the abnormal tracing that existed during the surgery of the right posterior tibial nerve.

G.     In failing to identify the latency of the tracing that existed during the surgery of the right posterior tibial nerve.

H.     In failing to instruct MARIBEL GOMEZ to notify Dr. Bruggeman of the changes in baseline and the significant changes in the bilateral posterior tibial nerve SSEPs and EMG activity.

I.     In failing to be in continuous communication with MARIBEL GOMEZ during the surgery of Roger Carlos regarding the bilateral significant changes in the bilateral posterior nerve SSEP's and EMG activity.

J.     In allowing a significant amount of time to go by between the normal baseline tracing and the significantly abnormal tracing before communicating the significantly abnormal tracing to Dr. Bruggeman.

K.     In failing to investigate the significant changes in the tracing after Dr. Bruggeman inquired as to the status of the IOM signals.

L.     In failing to interpret the neuromonitoring data and provide a medical diagnosis to Dr. Bruggeman.

M.     In failing to communicate with the surgical team, the reason why certain neuromonitoring data was not collected or communicated.

O.     In failing to provide contemporaneous supervision of Maribel Gomez and

further failed to provide contemporaneous interpretation and diagnosis of the neuromonitoring data as it was collected.

P.    In authoring a report that states that "The surgeon was notified of significant decreased amplitudes on bilateral lower responses during the hardware placement which did not improve by closing" which is inconsistent with the testimony of Dr. Bruggeman and therefore misleading and inaccurate.

Q.    The conduct described herein violates the patient safety regulations and the guidelines promulgated by the medical community for safe delivery of intraoperative neuromonitoring, including those set out by the American Medical Association and the American Clinical Neurophysiology Society, the American Academy of Physical Medicine and Rehabilitation, and the American Society of Neurophysiological Monitoring.

R.    All of the aforementioned acts or omissions on the part of DR. WILLIAM VANNESS constitute a willful and wanton disregard for the welfare, health and safety of Roger Carlos.

89.    MARIBEL GOMEZ breached the applicable standard of care and failed to perform as a reasonable and prudent certified neuromonitoring technician would perform under the same or similar circumstances would perform during the surgery of Roger Carlos on November 3, 2015 in the following particulars;

A.    In failing to assess and to monitor Roger Carlos neurological function during the surgery of November 3, 2015.

B.    In failing to identify the baseline tracing and comparing this tracing to the

loss of tracing of the left posterior tibial nerve.

C.    In failing to identify the abnormal tracing that existed during the surgery from the left posterior tibial nerve.

D.    In failing to identify the latency of the tracing that existed during the surgery of the left posterior tibial nerve.

E.    In failing to identify the baseline tracing and comparing this tracing to the loss of tracing of the right posterior tibial nerve.

F.    In failing to identify the abnormal tracing that existed during the surgery of the right posterior tibial nerve.

G.    In failing to identify the latency of the tracing that existed during the surgery of the right posterior tibial nerve.

H.    In failing to communicate to Dr. VanNess, the significant changes on the bilateral posterior tibial nerve SSEP's and EMG's during the surgery.

I.    In failing to appreciate the significant changes on the bilateral lower posterior tibial nerve SSEP's and EMG's and the significance it had on Roger Carlos' neurological status.

J.    In failing to appreciate the significant changes in the neurological status of Roger Carlos during hardware placement.

K.    In failing to maintain continuous communication with DR. VANNESS during the surgery on Roger Carlos.

L.    The conduct described herein violates the patient safety regulations and the guidelines promulgated by the medical community for safe deliver of intraoperative

neuromonitoring, including those set out by the American Medical Association and the American Clinical Neurophysiology Society, the American Academy of Physical Medicine and Rehabilitation, and the American Society of Neurophysiological Monitoring.

M.     In failing to communicate the significant changes on the bilateral lower tibial nerve SSEP's and EMG's and the significance it had on Roger Carlos' neurological status to Dr. Bruggeman or any of the surgical team.

O.     In failing to investigate the significant changes in the tracing after Dr. Bruggeman inquired as to the status of the IOM signals.

P.     All of the aforementioned acts or omissions on the part of MARIBEL GOMEZ constitute a willful and wanton disregard for the welfare, health and safety of Roger Carlos.

90.     All of the acts or omissions along with the previous allegations made against Co-Defendants, were the proximate cause to the injuries sustained by Roger Carlos.

91.     NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING were responsible for training their employees and having in place a method for communication that was constant such that during the cervical surgery procedures that the communication would be continuous and not interrupted. NATIONAL NEUROMONITORING SERVICES L.L.C., NEURODIAGNOSTICS AND NEUROMONITORING INSTITUTE, INC., AND SOUTH TEXAS NEUROMONITORING failed to comply with the standard of care for a reasonable and

prudent neuromonitoring company under the same or similar circumstances in the following particulars;

A.      Failing to train and ensure that MARIBEL GOMEZ was able to read and interpret neuromonitoring data such that critical changes could be identified and communicated to the neurologist and the surgical team.

B.      Failing to have an adequate method and medium of communication between the technician and the neurologist such that critical changes could be identified and communicated to the neurologist and the surgical team.

C.      Failing to have a limitation on the number of cases that were being monitored by the neurologist such that critical changes in the data could be identified without interference or distraction.

## XIX.   DAMAGES OF PLAINTIFF, ROGELIO CARLOS, III

92.     As a direct and proximate result of the acts and omissions outlined above, Plaintiffs have been severely damaged. Each Defendant, acting individually, or in concert with the other Defendants, has caused Plaintiffs to suffer the damages described below.

93.     Plaintiffs seek compensatory damages in an amount deemed sufficient by the trier of fact to compensate him for his damages, which includes but are not limited to past and future medical expenses and cost associated with medical treatment and care past and future, loss of the enjoyment of life's pleasures, past and future mental anguish, past and future pain and suffering, and past and future lost wages and lost

earning capacity, disfigurement, past and future.

94.    Plaintiff also seeks exemplary damages against each Defendant.

95.    Plaintiff has retained the services of the undersigned counsel, and claims entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988.

## IX.    DAMAGES OF, PLAINTIFF, MYRNA CARLOS

96.    Plaintiff, Myrna Carlos, incorporates paragraphs 1-78 as if fully set forth at length.

97.    A spouse has a cause of action for loss of consortium as a result of physical injuries caused to the other spouse by the negligence and gross negligence of a third party.

98.    A spouse has a cause of action for loss of services of the other spouse, which is separate from any cause of action for loss of consortium.

99.    Myrna Carlos hereby makes a claim for loss of consortium past and future which includes but is not limited to mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and felicity necessary to a successful marriage.

100.    Myrna Carlos hereby makes a claim for loss of household services past and future.

## X.    JURY DEMAND

101.    Plaintiff respectfully requests a trial by jury.

## XI.     PRAYER FOR RELIEF

100.    For these reasons, Plaintiff seeks a judgment against Defendants for:

a.      compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b.      exemplary damages;

c.      attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988;

d.      costs of court; and

e.      interest allowed by law for prejudgment or post-judgment interest.


Respectfully submitted,

By: _____/s/Philip G. Bernal_____
**Philip G. Bernal**
State Bar No. 02208758
phillip@krwlawyers.com
**Brian C. Steward**
State Bar No. 19201100
brian@krwlawyers.com
KETTERMAN ROWLAND & WESTLUND
16500 San Pedro, Suite 302
San Antonio, Texas  78232
Telephone:    (210) 490-7402
Facsimile:    (210) 490-8372

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on **August 9, 2017,** I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

Mark Kosanovich
markkosanovich@yahoo.com
FITZPATRICK & KOSANOVICH, P.C.
P.O. Box 831121
San Antonio, Texas 78283-1121
*Attorneys for Defendants City of San Antonio and San Antonio Police Department*

N. Mark Ralls
mralls@hdr-law.com
HOBLIT DARLING RALLS HERNANDEZ & HUDLOW LLP
300 Convent Street, Suite 1450
San Antonio, Texas 78205
*Attorneys for Defendants Carlos Chavez, Virgilio Gonzalez, James Ybarra, Mark Delgado, and Detective John Doe*


    */s/ Philip G. Bernal*
**Philip G. Bernal**
**Brian C. Steward**