# EXHIBIT A

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ROGELIO CARLOS, III AND          *
MYRNA CARLOS                     *
                                 *
                                 *
VS.              * CIVIL ACTION
                 * NO. 5:16-CV-00251-FB
                 *
CARLOS CHAVEZ, VIRGILIO   *
GONZALES, JAMES YBARRA, MARK  *
DELGADO, CITY OF SAN ANTONIO,  *
SAN ANTONIO POLICE DEPARTMENT  *
AND DETECTIVE JOHN DOE         *

------------------------------------------------------

ORAL & VIDEO DEPOSITION OF JAMES YBARRA
JANUARY 31, 2017

ORAL & VIDEO DEPOSITION of JAMES YBARRA, produced as a
witness at the instance of the Plaintiffs, and duly sworn, was
taken in the above-styled and numbered cause on JANUARY 31, 2017,
from 10:08 a.m. to 12:14 p.m., before Darlene Zuehl, Certified
Shorthand Reporter in and for the State of Texas, reported by
method of machine shorthand, at the Law Offices of Hoblit,
Darling, Ralls, Hernandez, & Hudlow, L.L.P., 6243 IH-10 West,
Suite 601, San Antonio, Bexar County, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions stated on the
record or attached hereto.

* * * * * *

## Page 2

```
 1          A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
      BY: BRIAN C. STEWARD, PHILIP G. BERNAL,
         KRIS HUFSTETLER
 4    KETTERMAN, ROWLAND & WESTLUND
      16500 San Pedro, Suite 302
 5    San Antonio, TX 78232
 6  FOR THE DEFENDANTS - CARLOS CHAVEZ, VIRGILIO GONZALES,
    JAMES YBARRA, MARK DELGADO AND DETECTIVE JOHN DOE:
 7    BY: N. MARK RALLS
      HOBLIT, DARLING, RALLS, HERNANDEZ, & HUDLOW, L.L.P.
 8    6243 IH-10 West, Suite 601
      San Antonio, TX 78201
 9
10  FOR THE DEFENDANTS - CITY OF SAN ANTONIO AND THE SAN ANTONIO
    POLICE DEPARTMENT:
11    BY: MARK KOSANOVICH
      FITZPATRICK & KOSANOVICH, P.C.
12    P.O. Box 831121
      San Antonio, TX 78283
13  ALSO PRESENT:
14    JAMES YBARRA,
        The Witness;
15
      SCOTT HEDEMANN,
16       The Videographer;
17    DARLENE ZUEHL,
        Certified Shorthand Reporter
18      in and for the State of Texas
19          * * * * * *
20
21
22
23
24
25
```

## Page 3

```
 1                I N D E X
 2                               PAGE
 3  STIPULATIONS ...........................  1
 4  APPEARANCES ............................  2
 5  SIGNATURE AND CHANGES ...................  80
 6  REPORTER'S CERTIFICATE .................  81
 7  EXAMINATIONS:              PAGE
 8  JAMES YBARRA
 9  Direct Examination By Mr. Steward: .......................4
10                EXHIBITS
11  NO.    DESCRIPTION              PAGE
12  34  Report ...........................30
13
14
                    -o-O-o-
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          THE VIDEOGRAPHER:  Today's date is January 31st,
 2  2017.  The time is 10:08 a.m.  This is the beginning of the
 3  deposition of Officer James Ybarra.  We're on the record.  Will
 4  the court reporter please swear in the Witness.
 5               JAMES YBARRA,
 6  having been first duly sworn, testified as follows:
 7               DIRECT EXAMINATION
 8  BY MR. STEWARD:
 9      Q  Officer, would you please state your full name?
10      A  James Ybarra.
11      Q  And who is your current employer?
12      A  City of San Antonio.
13      Q  And what is your rank?
14      A  Patrolman.
15      Q  And on May the 20th, 2014, were you a patrolman; was
16  that your rank?
17      A  Yes, still patrolman.
18      Q  Have you ever given a deposition before?
19      A  No.
20      Q  Okay.  My name is Brian Steward.  I'm one of the
21  attorneys that represents Rogelio Carlos, Jr.  I'm going to ask
22  you some questions about May the 20th, 2014.  Is it fair to say
23  that on May the 20th, 2014, you never talked to Roger Carlos?
24      A  Your client?
25      Q  Correct.
```

Page 5

1    A   Correct.
2    Q   You never saw him?
3    A   Correct.
4    Q   You weren't present when he was apprehended?
5    A   Correct.
6    Q   You weren't present when there was an altercation or a
7    struggle been various officers and him? .
8    A   Correct.
9    Q   We have some COBAN video from your vehicle that shows a
10   number of people, and we're going to talk about that at some
11   point, but I want to know if you had any discussions with -- I
12   think it's Virgil, or any of the other SWAT officers who were
13   involved in apprehending Mr. Carlos?
14           MR. RALLS:  Objection; vague as to time, but you
15   can still answer the question.
16           THE WITNESS:  Can you repeat the question, please?
17   Q   (BY MR. STEWARD:)  Sure.  And we'll get to the video,
18   but at approximately 2:50 on May the 20th, 2014, there's a group
19   meeting, and it's a number of different officers, and I think
20   Virgil was one of those officers.  So let me ask it this way:  Do
21   you remember Virgil being at the scene of the suspect's car after
22   the apprehension of the suspect?
23   A   No, I don't remember Car -- Carlos or Virgil being
24   there.
25   Q   Okay.  Is your badge number still 855?

Page 6

1    A   Yes.
2    Q   Are you still a SWAT?
3    A   Yes.
4    Q   What does SWAT stand for?
5    A   Special Weapons and Tactics.
6    Q   When did you join SWAT?
7    A   September 2006.
8    Q   Why did you join SWAT?
9    A   That's what I wanted to do.  Can you hear me?
10   Q   Sure.  In your experience, does SWAT officers have a
11   reputation within the force?
12           MR. RALLS:  Objection; vague.
13           THE WITNESS:  Can you repeat the question?
14   Q   (BY MR. STEWARD:)  Sure.  With your experience, over
15   10 years with SWAT, do you believe that SWAT officers have a
16   reputation within the SAPD?
17           MR. RALLS:  Objection; vague.
18           THE WITNESS:  Not that I know of.
19   Q   (BY MR. STEWARD:)  Back on May the 20th, 2014, did you
20   have a partner?
21   A   That's -- it probably takes a little bit more than a
22   yes or no answer.  I did have a partner back then, I believe, but
23   I was riding by myself, so he could have been off that day.
24   Q   During the course of this deposition, probably most of
25   my questions won't be yes or no.

Page 7

1    A   Okay.
2    Q   Some of them luckily may be.  Respond as appropriate.
3    A   Okay.
4    Q   If there's something you say that I want to follow up
5    on, trust me I'll ask you more questions.  If you don't
6    understand my question, you can ask me to rephrase it and I'll do
7    it.  When we start watching the video, take your time.  I doubt
8    you've watched your COBAN video recently, or have you?
9    A   I just did.
10   Q   Okay.  This morning?
11   A   Or parts of it --
12   Q   Okay.
13   A   -- not the full video.
14   Q   Okay.  Have you ever seen a transcript for the COBAN
15   video where the audio --
16   A   No.
17   Q   During the last 10 years, have you ever left your
18   assignment with SWAT?
19   A   No.
20   Q   You've never worked for internal affairs?
21   A   No.
22   Q   And on May the 20th, 2014, you would have been on the
23   day shift?
24   A   Correct.
25   Q   So you would have gone in around 10:00?

Page 8

1    A   Correct.
2    Q   And, in fact, when you first heard about the suspect,
3    you were eating lunch?
4    A   Correct.
5    Q   Where?
6    A   Alamo Cafe.
7    Q   Which one?
8    A   On I-10 and Wurzbach area.
9    Q   Who was with you?
10   A   I can't tell, like, exactly who was there, but I would
11   assume -- oh, I can't assume.  I would -- I believe it would be
12   Carlos, Virgil at the least.  I don't want to assume who was
13   there.  I guess everybody was on shift.  We normally eat
14   altogether.
15           MR. KOSANOVICH:  I'm sorry, what did you say?
16           THE WITNESS:  We normally eat all together.
17   Q   (BY MR. STEWARD:)  So Carlos Chavez?
18   A   I would think so.
19   Q   Possibly?
20   A   Possibly.
21   Q   And Virgil Gonzalez, possibly?
22   A   Possibly.
23   Q   And they're both SWAT members as well?
24   A   Correct.
25   Q   And they were in the same vehicle; correct?

Page 9

1    A   They ride together, correct.
2    Q   Do you know who drives?
3    A   No.
4    Q   Have you ever seen the COBAN footage from their
5  vehicle?
6    A   No.
7    Q   Are there SWAT tryouts?
8    A   Yes.
9    Q   What happens in a SWAT tryout?  What did you have to
10  do?
11    A   You test the applicant's firearm ability, their
12  physical ability, and then there's a background check, as far
13  as -- we find out from their supervisor or coworkers, you know,
14  their attendance at work and stuff like that.  There's an
15  interview process, and then there's a selection by the members.
16    Q   Have you ever been a part of the member selection
17  group?
18    A   Everybody is a part of the member selection.
19    Q   So in order for someone, while you have been on SWAT,
20  to become a part of SWAT, you had to be approved by the other
21  officers who were then members?
22    A   Correct.
23    Q   So there was a shooting corp, is that right, a shooting
24  part to this test?
25    A   Correct, uh-huh.  They're shooting standards, correct.

Page 10

1    Q   So you had to score over?
2    A   A 90.
3    Q   With what?
4    A   Pistol.
5    Q   And there's a PT test?
6    A   Correct.
7    Q   You had to score over 200?
8    A   Correct.
9    Q   And that combines sit-ups, pull-ups, push-ups, and a
10  run?
11    A   I don't believe there's pull-ups.  I believe it's body
12  fat.  There could be pull-ups in there now.  I don't remember.
13    Q   Certainly there was a timed run?
14    A   Timed run, uh-huh.
15    Q   1.5 miles?
16    A   Yes.
17    Q   And you had to do it in less than?
18    A   It's -- it's not less than.  There's not a maximum
19  time, but there's a -- there's a point scale.  To max out you
20  have to reach a certain point and then the next level a certain
21  point, but there's no end time.  You could walk it.  You just
22  might not get selected.
23    Q   When you went through the tryout, was there also an
24  obstacle course?
25    A   Correct.

Page 11

1    Q   And was there also, in that obstacle course, scenarios
2  that you had to complete?
3    A   Not when I went through it.
4    Q   Was there a target recognition test at the SWAT tryout?
5    A   You're talking about when I --
6    Q   Right.
7    A   No.
8    Q   Do you know if there's one now?
9    A   There are police scenarios involved, patrol scenarios
10  involved now.
11    Q   And when did that come into being?
12    A   Maybe three or four years ago.
13    Q   Do you know why?
14    A   We had a tryout coming up where -- a lot of the
15  applicants that come to the tryouts have gone through a basic
16  SWAT school before that we put on.  So we kind of get to see who
17  these people are, like, for 60 hours or six days straight, kind
18  of -- kind of how they interact with people, their teammates and
19  stuff like that.  And we had a tryout -- an opening on SWAT where
20  we haven't had a SWAT school in a year or so, so we didn't know a
21  lot of the applicants and their backgrounds, what kind of skills
22  they possess.  So it was suggested that we have patrol-based
23  scenarios added so we could kind of see how they -- what kind of
24  police officers they are, besides just running abilities and
25  shooting abilities and so we added that.

Page 12

1    Q   Who suggested that?
2    A   I couldn't tell you exactly who.  It would have come
3  from the officers on the team.
4    Q   Within SWAT is there any specialized training that you
5  receive?
6    A   Yes.
7    Q   And back when you started, can you tell me what that
8  training would have been?
9    A   There's a number of stuff that we go through to learn
10  all the new weapons that we're exposed to.  The chemical agents
11  that we're exposed to and stuff like that.
12    Q   Is there retraining?
13    A   There's team training once a week, and that covers vast
14  things of what we're expected to perform.
15    Q   Is there yearly tactical training?
16    A   Yes.
17    Q   Where?
18    A   That's put on throughout the year, different training
19  sites, put on by the members of the team.
20    Q   So the tactical training is actually provided by SWAT
21  officers?
22    A   That's correct.
23    Q   To SWAT officers?
24    A   Correct.
25    Q   Back in May of 2014, who was your supervisor?

Page 13

1    A   Mark Delgado.
2    Q   Is Detective Delgado still your supervisor?
3        MR. RALLS:  Objection --
4        THE WITNESS:  He's my sergeant, but yes, he is
5   still my supervisor.
6    Q   (BY MR. STEWARD:)  Is that officer the officer who
7   would evaluate you yearly?
8    A   Correct.
9    Q   Do you recall Chavez or Gonzalez going through the SWAT
10  selection or the SWAT tryout while you were an officer?
11   A   I've been on longer, yes.  Do I remember their
12  particular tryout, I couldn't tell you.
13   Q   Okay.  Where did you go to high school?
14   A   I'm sorry?
15   Q   Where did you go to high school?
16   A   Madison High School.
17   Q   When did you get out?
18   A   1991.
19   Q   When did you join the Marines?
20   A   1991.
21   Q   How long did you -- how long were you active duty?
22   A   I wasn't.
23   Q   What happened?
24   A   I was Reserve the whole time.
25   Q   How long were you in the Reserves?

Page 14

1    A   Eight years.
2    Q   Why didn't you go into active duty?
3    A   Because I wanted to go to college.
4    Q   Was it your understanding that you couldn't go to
5   college and go to the Marines?
6    A   My understanding was that it would have been easier to
7   do it Reserve and -- versus while active duty, me getting
8   deployed to different places.
9    Q   So as a Reserve officer with the Marines fair to say
10  you were never deployed?
11   A   No, it was peacetime.
12   Q   You went to SAC?
13   A   Yes.
14   Q   Did you get a degree?
15   A   Yes.
16   Q   When?
17   A   I don't know.
18   Q   In what?
19   A   Criminal justice.
20   Q   When you separated from the Marine Reserves, you were a
21  private?
22   A   No.  Staff sergeant, E-6.
23   Q   Okay.  What was your MOS?
24   A   Food services.
25   Q   Honorable discharge?

Page 15

1    A   Yes.
2    Q   And do you recall when you separated?  Was it 2000?
3    A   No, it was about the same time I joined SAPD.  I
4   would -- '99.
5    Q   Did the Marines pay for your education at SAC?
6    A   Part of it.  I had the GI Bill.
7    Q   You first joined the Bexar County Sheriff's Department;
8   is that right?
9    A   Correct.
10   Q   And from what we've seen, what has been produced to us,
11  it looks like you started in August of 1996.  Does that seem
12  about right?
13   A   About right.
14   Q   Did you -- were you a jailer?
15   A   Yes.
16   Q   For how long?
17   A   My -- the duration of it, about four years, I would
18  think.
19   Q   Did you receive any training regarding the use of force
20  from Bexar County Sheriff's Office?
21   A   Yes.
22   Q   And would all of that training have been focused on
23  interaction between the jailers and the inmates?
24   A   Can you repeat that?
25   Q   Sure.  Would that training have been focused on the

Page 16

1   interaction between jailers like you and inmates at Bexar County
2   Sheriff's Office?
3    A   Yeah, I would believe so.
4    Q   Did you ever receive any training from Bexar County --
5   Bexar County Sheriff's Office regarding civilians, non-inmates,
6   and the use of force?
7    A   I can't recall, but I would assume so.
8    Q   What was the training that you did receive regarding
9   the use of force?  What was it called?
10   A   Use of force training.
11   Q   Okay.  How was it provided to you?
12   A   Back then, in the sheriff's academy?
13   Q   Right.
14   A   Just probably classroom instructions and maybe some
15  hands-on.
16   Q   What did you generally learn?
17       MR. RALLS:  Objection; vague.
18       THE WITNESS:  The proper ways to apply force, I
19  would assume.
20   Q   (BY MR. STEWARD:)  In SAPD there are various rules in
21  the general manual that cover the use of force.  You're aware of
22  that?
23   A   Yes.
24   Q   Back at the Bexar County Sheriff's Department, were
25  there written rules which governed the use of force?

Page 17

```
 1      A   Yes.
 2      Q   When you started -- strike that.
 3          There's a point where you leave the detention
 4  center and actually become a peace officer with Bexar County; is
 5  that right?
 6      A   No, it was --
 7      Q   The opposite?
 8      A   It was hand in hand.  No.
 9      Q   Oh, at the same time?
10      A   Same time.
11      Q   Okay.
12      A   When you're working the jail, you're -- most people's
13  goal is to get on patrol, and to do that, you have to be a
14  licensed peace officer.
15      Q   And when did you become a licensed peace officer,
16  approximately?
17      A   I'm not too sure.  It was through SAC.  Before I left
18  Bexar County.
19      Q   From what we've seen it looks like you graduated with
20  your criminal justice degree in May of 1997.  Okay.  If that's an
21  accurate date --
22      A   I don't think that's an accurate date.
23      Q   Okay.
24      A   Are you talking about my degree or my peace officer's
25  license?
```

Page 18

```
 1      Q   No, your degree.
 2      A   No.  I believe I was on SAPD when I went back and got
 3  my associate's degree.
 4      Q   Okay.  Well, let me walk through it, then.  There's a
 5  point where you are -- I think you just testified you're on --
 6  you're a jailer as well as on patrol --
 7      A   No.
 8      Q   -- at Bexar County?
 9      A   No, not on patrol.  It's getting your peace officer's
10  license, but I'm still assigned to the jail.  So instead of a
11  jailer, I'm a deputy.
12      Q   Okay.
13      A   And that opens you up to more jobs you can apply for as
14  far as to transfer out of the jail.
15      Q   Why did you leave Bexar County to go to Travis County?
16      A   The money.
17      Q   When you started with Travis County in May of 1999,
18  were you a deputy or a jailer?
19      A   I believe they hired me as both.  I think I carried my
20  commission over there.  I was only there a short period, so I
21  could be wrong.  I could have just been a jailer.
22      Q   Looks like you were only there for five months.
23      A   Correct.
24      Q   Then you returned to San Antonio?
25      A   Correct.
```

Page 19

```
 1      Q   But you didn't start with SAPD for almost eight months;
 2  is that right?
 3      A   That's probably the time I was in the academy.  Maybe
 4  they considered me a civilian then.
 5      Q   How long is the academy, how many weeks?
 6      A   I'm not sure.
 7      Q   The records indicate that you -- your service start
 8  date was March 31st, 2000.
 9      A   That's the day we graduated the academy.
10      Q   So you've been with the force almost 17 years?
11      A   Almost 17.
12      Q   And Philippus was the chief when you started?
13      A   Correct.
14      Q   Going back to SWAT, and specifically going to May of --
15  or May the 20th, 2014, what was your assignment that day?
16      A   I don't believe we had a particular assignment besides
17  being available, like we always are, for follow-up units or
18  critical incidents and stuff like that.  We might have had a
19  directed patrol assignment, but I'm not sure.
20      Q   And do you remember if you were at Alamo Cafe when you
21  received notification about the suspect?
22      A   Yes.
23      Q   And how did you receive that notification?
24      A   I believe it was a phone call.
25      Q   Through a cell phone?
```

Page 20

```
 1      A   Correct.
 2      Q   From whom?
 3      A   Gabe DeLeon.
 4      Q   Who is that?
 5      A   He's a detective with SAPD.
 6      Q   Is he within SWAT or not?
 7      A   No.
 8      Q   Why would he call you, if you know?
 9      A   To help him out.
10      Q   And what were you told?
11      A   Got the highlights as far as his unit was following a
12  wanted person, and he asked for our help because the suspect had
13  a history of violence.
14      Q   Did he tell you anything else?
15      A   He may have.  I don't remember exactly what it was.
16  That's just the gist of what it was, that they needed help and
17  where they were at.
18      Q   Where were they?
19      A   At the time of the call, they were coming on 410 like
20  from Valley Hi area.
21      Q   Is it your understanding that he was in pursuit at that
22  point when he called you?
23      A   No, not in pursuit.  His unit works covertly, so
24  they're in unmarked vehicles.
25      Q   And was -- if you know, was there a specific officer
```

Page 21

```
 1   who was following the suspect?
 2       A   I don't know who was doing it.  They normally do it
 3   with multiple officers.
 4       Q   Have you ever seen any COBAN footage from the other
 5   officers who may have been following the suspect before you
 6   became involved?
 7       A   No.
 8       Q   When you assisted Del -- is it detective?
 9       A   Uh-huh.
10       Q   When you assisted Detective DeLeon, did you provide the
11   other SWAT members with that information?
12       A   Correct.
13       Q   Who?
14       A   The officers on duty eating with me.
15       Q   Anyone else?
16       A   Possibly my supervisor would have been informed too.
17       Q   So the officers that were eating with you, you just
18   would have told them?
19       A   Uh-huh, correct.
20       Q   The officer -- your supervisor, you would have had to
21   communicate with him?
22       A   Correct.
23       Q   How?
24       A   Either through a phone or through the radio
25   transmission.
```

Page 22

```
 1       Q   Is there any reason why Detective DeLeon didn't use a
 2   radio transmission to contact you --
 3           MR. KOSANOVICH:  Objection; form, calls for
 4   speculation.
 5       Q   (BY MR. STEWARD:)  -- if you know.
 6           MR. RALLS:  Same objection.
 7           THE WITNESS:  Can you repeat the question?
 8       Q   (BY MR. STEWARD:)  Sure.  Is there any reason why
 9   Detective DeLeon didn't contact you using a radio transmission as
10   opposed to a cell phone, which he used?
11           MR. KOSANOVICH:  Objection; form.
12           MR. RALLS:  Calls for speculation.
13           THE WITNESS:  Every time they object, I have a
14   hard time remembering.  You asked me why he didn't use the radio,
15   I don't know.
16       Q   (BY MR. STEWARD:)  If you know, right.
17       A   I don't know.
18       Q   Notice that during the course of this there will be
19   objections.
20       A   That's fine.  It's just that I want to make sure I'm
21   answering your question.
22       Q   Right.  And unless one of these fine lawyers tells you
23   not to answer the question, try to provide me with an answer.
24       A   Will do.
25       Q   Now, when they distract you and I have to repeat,
```

Page 23

```
 1   that's fine.  I'll do it as best I can, but invariably I change
 2   the question a little bit.  So listen to the second question
 3   that's asked because it may be a little bit different than the
 4   first one.  Okay?
 5       A   All right.
 6       Q   All right.  How long do you think it took before you
 7   first saw the suspect's vehicle?
 8       A   After the phone call?
 9       Q   Right.
10       A   10 minutes, 15 minutes.  I'm not too sure.
11       Q   So he had been -- well, strike that.
12           Who was the suspect?
13       A   I would have to look at my report to get his name
14   correct.
15       Q   Did Detective DeLeon give you the suspect's name?
16       A   I don't remember.
17       Q   Do you know if Detective DeLeon gave you a description
18   of the suspect?
19       A   I don't remember.
20       Q   Did he provide you with a description of the vehicle?
21       A   I don't remember.
22       Q   And I think you said a little bit earlier you would
23   have to look at your offense report?
24       A   Correct.  For the suspect's name?
25       Q   Right.
```

Page 24

```
 1       A   Correct.
 2       Q   Did you review your offense report before your
 3   deposition today?
 4       A   Correct.
 5       Q   What else did you review?
 6       A   The interrogatory questions, I believe they're called.
 7       Q   Right.  Anything else?
 8       A   We saw the COBAN video.
 9       Q   Anything else?
10       A   No.
11       Q   Did you have to prepare a use-of-force report regarding
12   the apprehension of the suspect?
13       A   No.
14       Q   After the apprehension of the suspect, did you ever
15   speak with Detective DeLeon about your pursuit of the suspect?
16       A   No.  Well, can you repeat that again?
17       Q   Want me to -- sure, sure, sure.  On the date of the
18   apprehension of the suspect, did Detective DeLeon come to the
19   scene?
20       A   I don't believe so.
21       Q   On that date, again, May the 20th, 2014, did you
22   contact Detective DeLeon and tell him, we have the suspect in
23   custody?
24       A   I don't believe I would have reached out to him
25   specifically.  That was probably broadcasted over the radio.
```

Page 25

1    Q   Did he ever, Detective DeLeon, contact you via phone
2  and ask you what had happened?
3    A   I don't believe so.
4    Q   And the cell phone you had would have been issued to
5  you by SAPD?
6    A   Correct.
7    Q   Now, going back to communications, you had, in your
8  patrol car, your radio; correct?
9    A   Uh-huh.
10   Q   A walkie-talkie?
11   A   Well, that's -- my police radio is issued to me.  It's
12  not in the car.
13   Q   Okay.
14   A   I had it on me.
15   Q   Where?
16   A   On my police belt.
17   Q   Can you describe it?
18   A   A handheld Motorola radio.
19   Q   Okay.  Any other forms of communication that would have
20  been on your body?
21   A   Cell phone.
22   Q   Okay.  Anything else?
23   A   Forms of communication, not that I know of.
24   Q   Where would -- for the radio, where would the mike have
25  been?

Page 26

1    A   It's in the radio, pick it up, handheld.
2    Q   So you wouldn't have a mike or --
3    A   Lapel mike.
4    Q   -- a lapel mike?
5    A   No.
6    Q   Right.  So if you needed to speak through the radio you
7  would have to actually pull it out and innervate it, or turn it
8  on?
9    A   Correct.
10   Q   How would you, with the radio, mute the radio?
11   A   I don't believe you can.  I mean, if you're not pushing
12  the button to speak --
13   Q   It's not going to communicate.
14   A   -- you're not going to communicate to anybody.  You'll
15  just receive transmission.
16   Q   Before you received the call on the cell phone, would
17  your radio have been dialed to a specific station or channel?
18   A   Correct.
19   Q   What?
20   A   The SWAT channel.
21   Q   Which is?
22   A   Three golf.
23   Q   Who has access to that channel?
24   A   Anybody with a police radio.
25   Q   If you wanted to contact other SWAT officers or

Page 27

1  patrolmen, was three golf the preferred channel?
2    A   If they're going to get ahold of us over the police
3  radio, it would be on three golf.
4    Q   And how would you actually turn your radio on to three
5  golf; what would you physically have to do?
6    A   There's buttons to change the prefix number from one to
7  three, and then there's a knob to change it from alpha to golf.
8    Q   Do you have any recollection as to when you first saw
9  or first contacted the suspect?
10   A   Yes.
11   Q   When, approximately?
12   A   In his vehicle, drove past me.
13   Q   So were you actually driving on what roadway when that
14  happened?
15   A   I was stopped at the access road of 410 and 151.
16   Q   And what happened when that vehicle rolled past you?
17   A   He had the green light, so he went -- I would call
18  it -- northbound on 151 access road, and I was stationary facing
19  west on the access road when the vehicle drove past.
20   Q   Did you contact any other officers to let them know
21  that you ID'd the suspect?
22   A   I'm sure I did.
23   Q   How?
24   A   Would have been over the police radio.
25   Q   Which channel?

Page 28

1    A   There's two different channels that normally get worked
2  off of because we're on SWAT.  One partner is on three golf,
3  one's on three lima, or actually, the working channel for that
4  day would have been three lima since we were helping out Gabe's
5  unit.  I was by myself, so I was going back and forth, so I don't
6  know.  It would have been one or the other.
7    Q   Before -- strike that.
8        Between the time that you received the phone call
9  from Detective DeLeon and actually seeing the suspect, do you
10  recall any information from other officers coming in about the
11  suspect?
12   A   Information that I received from other officers would
13  probably have been the direction of flight of the vehicle, as far
14  as where they're following him at, so we could meet up with them.
15   Q   Did you notice any other police officers when that
16  vehicle -- when the suspect drove past you?
17   A   No.
18   Q   Are you aware of any other vehicles or police officers
19  pursuing the suspect at the same time you did?
20   A   No.
21   Q   The offense report that you reviewed before the
22  deposition, that would have been just for the apprehension of the
23  suspect; correct?
24   A   Correct.  It's for the suspect, correct.
25   Q   Were there any eyewitnesses to the apprehension of that

Page 29

```
 1   suspect?
 2           MR. KOSANOVICH:  Objection; form, calls for
 3   speculation.
 4           THE WITNESS:  Besides policemen?
 5       Q   (BY MR. STEWARD:)  Right.
 6       A   No.
 7       Q   Who were the policemen involved in the apprehension of
 8   the suspect?
 9       A   I don't want to give the incorrect names, so I'm not
10   sure.
11       Q   Well, let me ask --
12       A   I believe Raul Romero was one of them, because he was
13   on my report as the transporting officer.
14       Q   What does the transporting officer do?
15       A   He took the suspect -- you transport the suspect from
16   location to where we needed him to go.
17       Q   Baptist Hospital?
18       A   It was a hospital, I'm not sure if it was Baptist, and
19   then to the jail.
20       Q   Would the transporting officer have stayed with the
21   suspect at whatever hospital it may have been and then
22   transported him to the jail, if you know?
23       A   For the most part, I would believe, unless they went
24   past their duty hours and then he would have been relieved.
25       Q   Any other officers that you can identify that were
```

Page 30

```
 1   involved with the apprehension of the suspect?
 2       A   No.
 3       Q   And this information about who the other officers may
 4   have been, whether they were eyewitnesses, that would all be
 5   contained in the offense report; correct?
 6       A   In my office report?
 7       Q   Yes.
 8       A   No.
 9       Q   Where would it be contained in?
10       A   In their reports.
11       Q   But if other officers were involved in the apprehension
12   of the suspect, and you did an offense report, you would list
13   those officers, would you not?
14       A   Not necessarily.  Sometimes you can just refer to their
15   reports.  They would have wrote a report also.
16           MR. STEWARD:  Let's go off the record for a sec.
17           THE VIDEOGRAPHER:  Time is 10:41 a.m.  We're off
18   the record.
19           (Recess taken)
20           (Exhibit 34 marked)
21           THE VIDEOGRAPHER:  Time is 10:51 a.m.  We're back
22   on the record.
23       Q   (BY MR. STEWARD:)  Officer, why -- why were you -- or
24   why were you given a cell phone?
25       A   We're on call.
```

Page 31

```
 1       Q   So they could reach you at any time?
 2       A   Correct.
 3       Q   Whereas, with the radio they might not be able to reach
 4   you because you might not have it with you?
 5       A   The cell phone is for -- 24 hours a day.  My radio
 6   might not be on 24 hours a day.
 7       Q   Okay.  We have placed in front of you a document, which
 8   I believe is your police report; is that correct?
 9       A   A copy of my police report, yes.
10       Q   And we --
11           MR. RALLS:  And take your time -- take your time
12   and look at it just to verify that we didn't make a mistake.  And
13   by -- by the way, for the record, yeah, it looks like it was
14   produced under RFP Carlos -- Response RFP 03275 to --
15           MR. STEWARD:  3279?
16           MR. RALLS:  Yeah.
17           MR. STEWARD:  Okay.
18       Q   (BY MR. STEWARD:)  Does that look like it's your
19   report?
20       A   Yes.
21       Q   It's four pages?
22       A   Yes.
23       Q   And it looks like from Page 1 these events started at
24   1420 hours?
25       A   Uh-huh.
```

Page 32

```
 1       Q   Is that right?
 2       A   Yes.
 3       Q   And you reported the events at 1600?
 4       A   Correct.
 5       Q   So it started about 2:20, and you reported it -- all of
 6   this at four o'clock?
 7       A   Correct.
 8       Q   Okay.
 9       A   When it says reported, that's probably the time I wrote
10   my report.
11       Q   And when you draft your report, physically what do you
12   have to do?
13       A   Nowadays, you log onto a computer and pull up the --
14   the form on the computer and fill it out.
15       Q   Is that what you did with this?
16       A   Yes.
17       Q   Where was the computer?
18       A   They -- they have them in the patrol car.  They have
19   them at the jail.  They have them at the substations.  I'm not
20   sure where this one was drafted at.
21       Q   And in that system there is a form that you actually go
22   through and fill out?
23       A   It looks just like this.
24       Q   Okay.  Did you have any assistance filling out this
25   form?
```

Page 33

1    A   No.
2    Q   So under "notified detective" on the first page there's
3  a check, and it has "Detective G. Valedez." Do you see that?
4    A   Yes.
5    Q   Who is that?
6    A   That was the detective in charge of this case.
7    Q   That was not the person who called you on the cell
8  phone?
9    A   That was not the person who called me.
10   Q   How did you get that name?
11   A   He was at the scene.
12   Q   And below that it has "notified supervisor," and it has
13  your supervisor's name; is that right?
14   A   Yes.
15   Q   Then below that it has "primary offense," and what does
16  it say or what's that code for?
17   A   Possession with intent to deliver controlled substance,
18  penalty group one, 4 grams to 200 grams.
19   Q   Of what?  Do you know what the substance was?
20   A   I believe it tested positive out in the field for
21  methamphetamine.
22   Q   And was methamphetamine found both inside the vehicle
23  and in the area around the vehicle?
24       MR. RALLS:  Objection; vague.
25       THE WITNESS:  Inside the vehicle and in the

Page 34

1  parking lot, correct.
2    Q   (BY MR. STEWARD:)  There was also a shotgun found; is
3  that right?
4    A   Yes.
5    Q   Where was that found?
6    A   In the suspect's vehicle.
7    Q   Was it found by you?
8    A   Yes.
9    Q   On the second page, under "details," there's a
10  reference to hair color.  Do you see that?
11   A   Yes.
12   Q   And someone wrote "black."
13   A   Yes.
14   Q   Is that you?
15   A   Yes.
16   Q   Eye color brown?
17   A   Yes.
18   Q   Medium build?
19   A   Yes.
20   Q   Facial hair, it indicated that he had a goatee?
21   A   Yes.
22   Q   You've got a reference here to his voice?
23   A   Yes.
24   Q   But there's no reference here to tattoos?
25   A   Yes.

Page 35

1    Q   Do -- do you believe that his tattoos were memorable?
2    A   I don't remember this guy's tattoos.
3    Q   Were they distinctive?
4    A   I don't know.
5    Q   Were the tattoos used as a part of your attempt to
6  identify this person?
7        MR. RALLS:  Objection; vague as to time.
8        THE WITNESS:  No.
9    Q   (BY MR. STEWARD:)  Did the telephone call or the cell
10  call inform you of the warrant?
11   A   Yes.
12   Q   And what was the warrant for?
13   A   Family violence, felony offense, I believe.
14   Q   When?
15   A   When was the family violence?
16   Q   Right.
17   A   I don't know.
18   Q   Did that matter?
19   A   The time of the offense, no.
20   Q   Below that, under "arrest," it has 1425 as the arrest
21  date and time; is that right?
22   A   I don't see where you're look -- okay.  I see.
23  Correct.
24   Q   Is it your understanding that the suspect was under
25  arrest at that time?

Page 36

1    A   That's probably a close estimate.
2    Q   Once the suspect was under arrest, who would you have
3  notified?
4    A   The requirements for notification, I don't think
5  there -- there is any, but it would have just been over the
6  police radio.
7    Q   Which channel?  Lima?
8    A   Probably lima, but could have been golf.
9    Q   You were aware, at the time of his arrest, that there
10  were other SWAT officers responding?
11   A   Can you repeat that?
12   Q   You were aware, at the time of the arrest, if it's at
13  around 1425 on May the 20th, 2014, that there were other officers
14  that were responding?
15   A   Yes.
16   Q   Other officers, including the people you had lunch
17  with?
18   A   Yes.
19   Q   So do you recall specifically going to three golf and
20  telling other SWAT members that the suspect was under arrest?
21       MR. RALLS:  Objection; mischaracterizes testimony.
22       THE WITNESS:  I was the only SWAT officer working
23  by themselves, so every other person would have been able --
24  every other team would have been able to monitor three lima and
25  three golf at the same time, so if it was broadcasted over the

Page 37

1    radio by me, whichever channel, they should have been notified.
2        Q   (BY MR. STEWARD:)  Have you ever had a conversation
3    with Carlos Chavez or Virgilio Gonzalez about when they first
4    became aware that this suspect had been placed under arrest?
5        A   Repeat, please.
6        Q   Sure.  Have you had a conversation since this took
7    place with Carlos Chavez or Virgilio Gonzalez about when they
8    first learned that the suspect had been placed under arrest by
9    you?
10           MR. RALLS:  Let me just make an objection and
11   instruct you not to answer any con -- about any conversations
12   that you had with them after the lawsuit was filed, after you
13   were served with the lawsuit, so -- but prior to that is fine.
14           THE WITNESS:  Specific conversations, I can't
15   recall.
16       Q   (BY MR. STEWARD:)  You are aware that they pursued and
17   apprehended another individual; correct?
18       A   Correct.
19       Q   And at the time you apprehended the suspect, you could
20   not see them, could you?
21       A   Correct.
22       Q   You could not hear them?
23       A   Correct.
24       Q   You did not know where they were?
25       A   Correct.

Page 38

1        Q   They did not come to assist you in apprehending this
2    suspect, did you -- did they?
3        A   Correct.
4        Q   At any point after he was apprehended, did they come
5    and assist you?
6        A   I don't believe so.
7        Q   Looking at your four-page report, can you now identify
8    who the suspect was?
9        A   Jose Gonzalez -- Josue Gonzalez.
10       Q   And other than the things that you've written in the
11   details, can you provide a description of him?
12       A   No.
13       Q   Do you know if he was tried?
14       A   No.
15       Q   Did you participate in the trial?
16       A   No.
17       Q   Under a statement of probable cause there -- there's
18   information that's typed.  Did you type that information?
19       A   Yes.
20       Q   How were you able under arrestee drug use -- strike
21   that.
22           Was that historical arrestee drug use?
23       A   It's related because the methamphetamines were found in
24   the vehicle and in the parking lot.
25       Q   Were you able -- at the bottom of Page 2, were you able

Page 39

1    to take the VIN from that Camry and run it?
2        A   I would have run the license plate versus the VIN.
3        Q   How about a serial number?  Did you run any serial
4    numbers from either the shotgun or potentially the vehicle at the
5    scene?
6        A   That would have been done -- whether it was by me or
7    somebody else, it would have been done.
8        Q   Do you know if that was the serial number for the
9    shotgun?
10       A   I would assume it was, yes.
11       Q   So on the third page you identify the things that were
12   taken from that vehicle; is that correct?
13       A   Where are you seeing that at?  For recovery --
14       Q   Down --
15       A   -- property.
16       Q   Correct.
17       A   Okay.
18       Q   So there's one firearm, which was a shotgun.  Do you
19   see that?
20       A   Yes.
21       Q   And do you know what kind of a shotgun it was, and by
22   that, I mean gauge?
23       A   No.
24       Q   So going to the -- the last page.  You were asked by
25   Detective DeLeon to switch your radio to three lima?

Page 40

1        A   Uh-huh.
2        Q   Would that have been at 1420 or before that?
3        A   No, it would have been before that.
4        Q   Do you know what time?
5        A   No.  When the phone call happened, around 1400, I would
6    believe.
7        Q   Okay.  You were told the other detectives were
8    following the suspect in a gold Camry and that the suspect was
9    wanted on a felony warrant; is that right?
10       A   Correct.
11       Q   Suspect had a history of violence; correct?
12       A   Correct.
13       Q   You then switched to three lima, and you were able to
14   catch up to the suspect at Highway 151 and Loop 410?
15       A   Correct.
16       Q   Now, did you catch up to him or did he pass you?
17       A   It's a play on words, but we met there at --
18       Q   Okay.  You switched your radio back to three golf to
19   double-check that other SWAT units were nearby?
20       A   Uh-huh.
21       Q   Well, you knew that at least one vehicle containing two
22   SWAT officers were also assisting at that point?
23           MR. KOSANOVICH:  Object to the form of the
24   question.
25           MR. RALLS:  Objection; assuming facts not in

Page 41

1   evidence at this point.
2       Q   (BY MR. STEWARD:)  Did you know, after the phone call
3   at Alamo Cafe, that Chavez and Gonzalez were going to assist you?
4       A   Yes, I knew that.
5       Q   Okay.  So when you switched your radio back to three
6   golf to double-check that the other SWAT units were nearby, did
7   you have an understanding as to where Gonzalez and Chavez were
8   going?
9       A   No.  I knew the people that were eating with me were
10  going to try to locate the suspect also, but I was by myself and
11  I was the first one to pay.  So I left before everybody else.
12  Now, they would have left after they paid their bill.  So that's
13  why I wanted to see where they were at.
14      Q   Were they going to go to generally the same place that
15  you were going to?
16      A   Uh-huh.
17      Q   Which was where?
18      A   They were -- they would have listened to the trans --
19  the broadcast over the radio to find out where the suspect was
20  at.
21      Q   Who was going to participate in setting out the
22  quadrant?
23      A   The officers who were showing up to help me out.
24      Q   How many officers are necessary to create a quadrant?
25      A   Are necessary?

Page 42

1       Q   Right.
2       A   I don't know.  More than one would probably be the
3   minimum.
4       Q   Did you have an understanding as to how many SWAT
5   officers were responding?
6       A   Did I have an understanding?
7       Q   Sure.
8       A   More than one group.
9       Q   Well, you were sitting with two of them?
10      A   Yeah, that's one unit.
11      Q   Okay.  Did anyone else contact you during your pursuit
12  of the suspect and tell you, hey, we're in pursuit also?
13      A   I would have to listen or find the transcript, but I
14  don't know if anybody acknowledged that they were behind me,
15  but -- or trying to catch up to us.
16      Q   Transcript of what?
17      A   Or the tape to listen to the radio transcripts or the
18  radio broadcast.
19      Q   On which channel or both?
20      A   Yeah, or both, yeah.
21      Q   So you could go to the transcript of three lima or
22  three golf from --
23      A   No.  I was talking about this radio that's played on my
24  COBAN.
25      Q   Okay.

Page 43

1       A   I could hear the transcripts -- or I could hear the
2   radio broadcast.
3       Q   Okay.  And I think I asked earlier, but I want to make
4   sure, have you ever seen a transcript of your COBAN?
5       A   No.
6       Q   You did not inventory the Camry until after the suspect
7   was under arrest; is that right?
8       A   Inventory, I just collected the evidence or somebody
9   collected the evidence.  I'm not sure it was inventoried or who
10  did that.
11      Q   The property was not collected until after the suspect
12  was apprehended and handcuffed?
13      A   Correct.
14      Q   Who is Officer Rodriguez?
15      A   He is a member of the SWAT team.
16      Q   So that's another unit of SWAT that was present?
17      A   Correct.
18      Q   Who was his partner?
19      A   He was fairly new then.  I don't know who he would be
20  riding with.
21      Q   Do you know was he -- what he was riding in?
22      A   A patrol car or -- yeah, is that what you were asking?
23      Q   Who was in the white truck?
24      A   I don't know.
25      Q   And the testing of the methamphetamines, would that

Page 44

1   have been done by the detective?
2       A   It says here that Detective Valedez tested it.
3       Q   And would that have been done prior to your completing
4   this report?
5       A   Yes.
6       Q   Let's watch the video because there are a few things on
7   the video that I want some clarification on.
8       A   Okay.
9       Q   And I think you stated a little bit earlier that you --
10  you actually saw the video.
11      A   I saw up until when he bails out of the car.
12      Q   Okay.  So you didn't watch after, when other officers
13  respond and go to the vehicle?
14      A   No.
15      Q   Okay.  Some of this will be fairly new to you.
16      A   Okay.
17          (Video Playing.)
18      Q   (BY MR. STEWARD:)  So this is the first footage that we
19  have.
20      A   Okay.
21      Q   And can you tell the jury what is depicted in this
22  footage?
23      A   That's the suspect vehicle in front of me, and that's
24  the front of my patrol car.
25      Q   And where is that?

## Page 45

1  A  The shopping center near 151 and 410.
2  Q  There's a point where you start seeing letters on the
3  display, like L and M and one.  What does that mean?
4  A  I believe it's the lights are activated and then the
5  microphone is activated.
6  Q  Where would the mike --
7  A  I would have to seen the -- what you're talking about.
8  Q  Okay.  But L may be light?
9  A  Uh-huh.
10  Q  So your lights would not have been on at this point; is
11  that right?
12  A  No, they're not on.
13  Q  What does that mean?
14  A  Mike on -- mike one on, so.
15  Q  How is that turned on or off?
16  A  I believe the L is when I activated my lights, it
17  automatically turned on the microphone.
18  Q  So if the lights are on the mike is automatically
19  turned on?
20  A  (Moving head up and down).
21  Q  Is there a way to turn the mike off but the lights
22  still being on?
23  A  Yes.
24  Q  How?
25  A  There's a mute button on your microphone that goes to

## Page 46

1  the camera.
2  Q  And where is that microphone?
3  A  And there's also a video cutoff on the screen.
4  Q  So going back to the mute button on the microphone,
5  where would that be physically?
6  A  Wherever the officer has his microphone.
7  Q  Where did you have your microphone?
8  A  I don't know.
9  Q  Okay.
10  A  The COBANs were very fairly new back then for us, so
11  I've put it in several different spots to try to find out the
12  best for me.
13  Q  What locations have you tried?
14  A  Front of my belt, pocket, on my radio holder, on my
15  shirt.
16  Q  Your lapel?
17  A  No.  Like in the front of my shirt.
18  Q  Okay.  So there it says L, which you have identified,
19  and M.  What does that mean?
20  A  I'm not sure.
21  Q  How about one?
22  A  I'm not sure.  There's audio that should be playing,
23  but I don't hear it.
24  Q  I'm not sure if we're -- all right.  Well, we'll get
25  back to the audio.  So at this point, which access road are you

## Page 47

1  going onto?
2  A  That's 151.
3  Q  And there's no indication at this point, from at least
4  visually, that anything other than the lights and this -- and a
5  mike might be on, if that's what M1 stands for; is that right?
6  A  Can you --
7      MR. RALLS:  Okay.
8      THE WITNESS:  Can you repeat the question, please?
9  Q  (BY MR. STEWARD:)  Sure.  Just based upon the display,
10  I see L and I see M1, but I don't see anything else.  So it's not
11  muted at this point; correct?
12  A  Correct.
13  Q  Because if it was, there would be something that
14  indicated that it was muted?
15      MR. KOSANOVICH:  Objection; form, calls for
16  speculation.
17      MR. STEWARD:  If you know.
18      THE WITNESS:  I don't know.
19  Q  (BY MR. STEWARD:)  So where are you at this point when
20  you exit the roadway -- or exit the highway?
21  A  That's -- that's 151, so I'm now on the access road of
22  151.
23  Q  And the vehicle that's immediately in front of you,
24  that's the gold Camry?
25  A  Correct.

## Page 48

1  Q  With the suspect -- suspect in it?
2  A  Correct.
3  Q  At that point, were you able to determine if the
4  suspect had any other people in the vehicle?
5  A  No.
6  Q  And you certainly weren't able at this point to figure
7  out or determine where he was going?
8  A  Correct.
9  Q  Were you able to dispatch other officers to an area
10  where they might intercept the gold Camry?
11      MR. KOSANOVICH:  Object to the form of the
12  question.  Go ahead.
13      THE WITNESS:  I'm updating our location as we're
14  moving.  Does that answer your question?
15  Q  (BY MR. STEWARD:)  It does.  So now you're approaching
16  the Hyatt Hill Country; is that right?
17  A  I believe so.
18  Q  And beyond the Hyatt Hill Country you will get to the
19  Rudy's parking lot?
20  A  Okay.
21  Q  And still, as far as you know, you're the only
22  vehicle -- the only police vehicle that's pursuing --
23  A  Correct.
24  Q  -- the suspect?
25  A  Correct.

Page 49

1    Q   And is that the Rudy's that he ultimately pulls in?
2    A   Yes.
3    Q   Are you familiar with that Rudy's?
4    A   Yes.
5    Q   How many ways are out of that Rudy's are there or were
6    there on May the 20th, 2014?
7    A   At least two.
8    Q   Is there access to the Rudy's on this access road?
9    A   Yes.
10   Q   So, at this point, you can see that he's pulled into
11   the Rudy's?
12   A   Yes.
13   Q   But because of the camera angle you can't really see
14   much of his vehicle, only the top; fair?
15   A   The camera can only see that.  I can --
16   Q   Well, what can you see?
17   A   Wherever my point of view was at.
18   Q   Where is the -- the camera placed for the COBAN system
19   on the vehicle?
20   A   To the right of the rearview mirror.
21   Q   So it's above you and slightly to the right?
22   A   Correct.
23   Q   So at this point -- back this up.  As you're
24   approaching, do you ever see him actually exit the vehicle?
25   A   Yes.

Page 50

1    Q   Is the door open or closed in this?
2        MR. RALLS:  Objection; vague.
3        THE WITNESS:  I can't tell.  It looks closed, but
4    I can't tell.
5    Q   (BY MR. STEWARD:)  Is it your understanding that when
6    the suspect exited the vehicle, he left the door open?
7        MR. KOSANOVICH:  Objection; form, calls for
8    speculation.
9        THE WITNESS:  Is it my understanding he left the
10   door open?
11   Q   (BY MR. STEWARD:)  What did you see?
12   A   I don't know.
13   Q   Okay.  This door looks closed --
14   A   Okay.
15   Q   -- fair?
16   A   It looks closed.
17   Q   Do you know if he's exited the vehicle at this point?
18   A   Yes.
19   Q   Do you know where he ran?
20   A   Yes.
21   Q   Where?
22   A   Up and to the left -- behind the building to the left.
23   Q   So the building to the left is actually the Rudy's
24   Bar-B-Q?
25   A   Correct.

Page 51

1    Q   So you believe that at the time you're in this
2    location, he is on the other side of the Camry, but he has not
3    cleared the building yet, or do you know?
4    A   He -- I do not have sight of him now.  I saw a brief
5    glimpse of him coming into the driveway and he was already on
6    foot, going behind the building.
7    Q   So you wanted to loop around the building to get to the
8    parking lot?
9    A   Yeah.  That's the parking lot -- we're already in the
10   parking lot, but it goes all the way around the building.
11   Q   So did you believe that he was, as of 2:24, somewhere
12   in this parking lot or in the woods beyond the parking lot --
13   A   I didn't --
14   Q   -- or did you know?
15   A   I did not believe he was, at this time, into the woods.
16   I don't think he would have had time to make it that far.
17   Q   Where was he found?
18   A   He was eventually found in the woods.
19   Q   Where?
20   A   Point to it is fine?
21   Q   Please.
22   A   This way, along the access road.
23   Q   Okay.
24   A   If you back up you can see it a little bit there.
25       MR. KOSANOVICH:  Brian, he just pointed at the

Page 52

1    screen.  If we could just mark that at 2:24:20 that is what he is
2    pointing to.
3        MR. STEWARD:  Yeah.
4        MR. KOSANOVICH:  This was -- just as a point of
5    reference.
6    Q   (BY MR. STEWARD:)  Let me see if I can back up a little
7    bit because you may be able to show us.  Does this -- and this
8    would be -- well, we'll figure that out.  Does this footage or
9    this still show you the location where he was apprehended?
10   A   Roughly, uh-huh.
11   Q   Let me see if I can get a time.  Okay.  So using the
12   same time frame, but maybe a second or two earlier.  So at this
13   point, you did not know where he was?
14   A   Correct.
15   Q   You -- why do you decide to turn around rather than
16   going down into that parking area or the woods to pursue him?
17   A   I didn't know where he was at.  I was worried that he
18   might double back to his car, so I go back to his car.
19   Q   So now the door is open.  Do you see that?
20   A   Yeah.
21   Q   When he exited the vehicle, were you able to determine
22   what he was wearing?
23   A   Yes.
24   Q   What did you see?
25   A   What I saw and what -- was a white T-shirt, blue jeans.

Page 53

1    Q   So that was consistent with the description that had
2   been given to you previously?
3    A   I don't believe a clothing description was given
4   before.
5    Q   Okay.  So white T-shirt, blue jeans.  Anything else?
6    A   No.
7    Q   So this would indicate that the ignition was off?
8    A   Yeah.
9    Q   And when the ignition is off --
10       MR. KOSANOVICH:  Objection; form, calls for
11   speculation.
12    Q   (BY MR. STEWARD:)  What does the "IGN off" mean?
13    A   I'm not sure.
14    Q   Okay.  All right.
15       MR. KOSANOVICH:  Well, I apologize.  I thought you
16   were asking him about ignition in the Camry.
17       MR. STEWARD:  No, no, no.  No, no, no.  On the
18   screen.
19       MR. KOSANOVICH:  Okay.  I'll withdraw that
20   objection.
21    Q   (BY MR. STEWARD:)  Do you know if when you walked over
22   to the Camry it was -- the key was in the ignition or not?
23    A   Yes.
24    Q   Was it on?
25    A   I don't know for sure.

Page 54

1    Q   Okay.  Is that you?
2    A   Yes.
3    Q   What were your intentions at this point?
4    A   Make sure he didn't double back and then secure the
5   vehicle, so he can't double back.
6    Q   And tell me what you're doing at this point.
7    A   Reaching in, taking the keys out, and then lock the
8   door.
9    Q   Was there -- were there any jackets or clothing in the
10   vehicle?
11    A   Not that I remember.
12    Q   Was the shotgun visible at this point?
13    A   Yes.
14    Q   Where was the shotgun?
15    A   Passenger side floorboard with the butt of the stock
16   and the grip pointing towards the driver side seat.
17    Q   Did you notice anything in the back seat?
18    A   No.
19    Q   So now you have the keys, and do you have your radio in
20   your hand?
21    A   Yes.
22    Q   And who were you going to contact?
23    A   Oh, I'm not exactly sure what I'm saying there, but the
24   process would have been to set up a perimeter and try to locate
25   the suspect.

Page 55

1    Q   At this point, now that you've secured the car, it was
2   your intention to go and look for the suspect; right?
3    A   Yes.
4    Q   Who else was looking for the suspect?
5    A   Everybody who was working the same case I was.
6    Q   With respect to the other SWAT officers, you had paid
7   first so you had actually left the restaurant first?
8    A   Yes.
9    Q   So they were behind you, as far as you knew?
10    A   Yes.
11    Q   Have you ever looked at the COBAN video to see if you
12   can see their vehicle when it pulls past or between the Bill
13   Miller and the Rudy's?
14    A   No.
15    Q   Are you aware of the path that that unit traveled to --
16   traveled before it encountered my client, Roger Carlos?
17    A   No.
18    Q   Let me move it up a little bit.  When you're pursuing
19   the suspect, you have the radio that you have to actually
20   physically push a button to turn on; right?
21    A   Yes.
22    Q   Is -- are there any other devices -- communication
23   devices that you would have which would have reported the audio
24   from any encounter between the suspect and you?
25    A   Can you repeat that, please?

Page 56

1    Q   Sure.  Did you have any other communication devices
2   which would have recorded the encounter between the suspect and
3   you?
4    A   No.  Besides the COBAN mike; is that what you're
5   asking?
6    Q   Right.
7    A   Just my radio and my COBAN mike.
8    Q   So the COBAN mike, wherever it was placed on your body,
9   how far could you go away from the vehicle for it to record?
10    A   I'm not sure of the exact distance.
11    Q   Okay.  Okay.  That was -- we just started back at 2:27.
12   The truck that just passed by was not law enforcement; fair?
13    A   I would assume.
14    Q   So based upon your police report, at this point you
15   were helping to apprehend the suspect; correct?
16    A   I don't want to say helping out with, but other
17   officers had already, I guess, arrested him, detained him, or
18   struggled with him already, all that stuff.
19    Q   Was there a struggle with him?
20    A   Yes.
21    Q   What happened?
22    A   I'm not sure.
23    Q   Were you involved in the struggle?
24    A   No.
25    Q   Did you observe the struggle?

Page 57

```
 1      A   No.
 2      Q   Did they tell you about the struggle?
 3      A   That they were going to arrest him or that he resisted
 4   and that would be a charge on him.
 5      Q   So in the report where there are references to pushing
 6   and resistance, that's information that was provided to you, not
 7   information that you -- that you actually saw?
 8      A   Correct.
 9      Q   So who do you consider the arresting officers to have
10   been?
11      A   Well, it would have been me.  I would have been
12   considered the person to initiate it, so that would have been me,
13   but the only one that I know is the one I referred to as
14   transporting the officer, would be Raul Romero.
15      Q   Okay.  We're going to move to 2:36.  All right.  It
16   stopped.  Okay.  All right.  Here is 2:35:48.  Were you familiar
17   with this area?
18      A   It's not -- not very familiar.
19      Q   Okay.  Did you -- when the officers were creating a
20   quadrant, did you instruct the officers where to go?
21      A   No.
22      Q   So it is 1436 at this point, so the suspect is in
23   custody?
24      A   Correct.
25      Q   Correct?
```

Page 58

```
 1      A   Correct.
 2      Q   But you were not the person who actually placed him in
 3   handcuffs?
 4      A   Correct.
 5      Q   Let me ask you what that meant.  On the screen there,
 6   the MIC-1.  Does that mean mike one, or do you know?
 7      A   I would assume, yes.
 8      Q   And beside that it has UNMU, what does that mean?
 9      A   I would take that as being unmuted.
10      Q   So is there a way or does the system automatically mute
11   at some point?
12      A   No.
13      Q   So someone would have had to mute the mike prior to
14   this point?
15      A   It would have been me.  That's my mike.
16          MR. KOSANOVICH:  Objection to form, calls for
17   speculation.
18          MR. RALLS:  Yeah, and assumes facts not in
19   evidence.
20      Q   (BY MR. STEWARD:)  Did you have more than one mike?
21      A   No.
22      Q   Why would you have muted your mike during your pursuit
23   of the suspect?
24      A   I don't believe this is in the pursuit of the suspect.
25   I believe he's already --
```

Page 59

```
 1      Q   He's caught?
 2      A   He's already caught, uh-huh.
 3      Q   So why would you mute your mike after the suspect was
 4   in custody?
 5          MR. KOSANOVICH:  Object to the form of the
 6   question.
 7          MR. RALLS:  Objection; assume -- assumes facts not
 8   in evidence.
 9          THE WITNESS:  It would be -- I could do it for a
10   number of reasons, receiving a personal phone call, talking to
11   the detective about the case, stuff like that, that's -- that
12   you're allowed to mute your mike.
13      Q   (BY MR. STEWARD:)  Do you recall specifically why?
14      A   No, I don't know.
15      Q   Thank you.
16      A   It could have been done by accident, because it's just
17   a button, but I don't know why.
18          MR. RALLS:  I'm sorry, I couldn't hear your
19   response.
20          THE WITNESS:  I said, it could have been by
21   accident also because it's -- there's just a button to push.
22      Q   (BY MR. STEWARD:)  Now, is that you again?
23      A   That's me again.
24      Q   And why were you returning to the Camry?
25      A   Let me see.  I don't know.
```

Page 60

```
 1      Q   You had the keys at this point; right?
 2      A   Yes, uh-huh.
 3      Q   So you went to the trunk of the vehicle and opened it
 4   up; correct?
 5      A   Yes.
 6      Q   Did you see anything?
 7      A   Nothing of value I would believe.
 8      Q   None of the property that's listed in the police report
 9   came from that trunk, did it?
10      A   Correct.
11      Q   Had you called for K-9 at this point?
12      A   No, I didn't.
13      Q   Do you know if K-9 assisted based upon what they heard
14   on three lima?
15      A   I don't know.
16          MR. KOSANOVICH:  Objection; form, calls for
17   speculation.
18      Q   (BY MR. STEWARD:)  Does -- or would K-9 have access to
19   three golf?
20      A   They have access to it, yes.
21      Q   So this is the second time you've entered the vehicle;
22   correct?
23      A   Yeah, I think so.
24      Q   And you've seen the shotgun previously?
25      A   Uh-huh.
```

Page 61

1   Q   When do you discover the baggy of meth?
2   A   I believe shortly after this right here.
3   Q   And what's the procedure for the SWAT officers when
4   they discover drugs or a weapon?
5        MR. RALLS:  Objection; compound.
6        THE WITNESS:  Just like any policeman, just to
7   observe the evidence and collect it or have -- just have it
8   collected.  It doesn't necessarily have to be by you, somebody
9   else.
10  Q   (BY MR. STEWARD:)  The officers that assisted you,
11  where did they park?
12  A   I don't know.
13  Q   Were the officers that assisted you plain clothes?
14  A   There was both, uniform and patrol, or covert.
15  Q   Okay.  What does mike-1 mute mean?
16  A   I would have muted my mike.
17  Q   And after viewing this, can you tell us how you muted
18  it?
19  A   No, I don't know.  It would have been with my hand.  I
20  just don't see it.  If you play it, I can --
21  Q   Okay.
22  A   I don't know.
23  Q   At this point, it doesn't appear that you're talking on
24  your radio; correct?
25  A   I'm not on my radio, correct.

Page 62

1   Q   And you're not on your cell phone?
2   A   Correct.
3   Q   Do you know who that is?
4   A   No.
5   Q   It's not a police officer?
6   A   No.  He's an employee of Rudy's.  I don't know who he
7   is, though.
8   Q   Did you ever go back to Rudy's and ask if Rudy's had
9   surveillance film of the parking lot?
10  A   No.
11  Q   Do you know if Rudy's had surveillance film of the
12  parking lot?
13  A   No.  I don't know.
14  Q   Whose truck is that?
15  A   I don't know.
16  Q   This is at 2:42, and the gentleman in shorts and a blue
17  shirt and a badge gets out.
18  A   Yes.
19  Q   Who is that?
20  A   That's William Garcia.
21  Q   Who is Mr. Garcia?
22  A   He's a detective.
23  Q   And is he assigned to SWAT?
24  A   No.
25  Q   Who contacted Mr. Garcia or Officer Garcia?

Page 63

1   A   He -- I don't know.  Probably -- he was just working
2   the case probably also.
3   Q   And did you know him before May the 20th, 2014?
4   A   Yes.  Yes.
5   Q   And do you have any understanding as to his experience
6   level?
7   A   No.
8   Q   Or his assignment on that date?
9   A   I don't know his exact assignment that day, no.
10  Q   Generally, what do you think it was?
11  A   He would be assigned to the same unit that was
12  following the suspect; it would have been HITDA.
13  Q   And what does that unit generally do?
14  A   I don't know their mission statement.  I do not know.
15  Q   Do you know if Garcia had pursued the suspect in
16  addition to you?
17  A   Don't know.
18  Q   Do you know if Officer Garcia removed anything from the
19  vehicle?
20  A   No, I'm not sure.  He may have been the one that
21  collected the evidence, or it could have been somebody else.  I'm
22  not sure.
23  Q   He was not, though, involved in the apprehension of the
24  suspect?
25  A   No, uh-huh.

Page 64

1   Q   And as far as you know, he was not involved in the
2   interaction with my client, Roger Carlos?
3   A   As far as I know.
4   Q   A second patrol car arrives.  Do you see that?
5   A   Yes.
6   Q   Do you know who is in that vehicle?
7   A   Not yet.
8   Q   Who is that?
9   A   Frank Rodriguez.
10  Q   Now, was Officer Rodriguez in SWAT?
11  A   Yes.
12  Q   And was Officer Rodriguez responding to your calls for
13  assistance?
14  A   Yes.
15  Q   Do you know where Officer Rodriguez had been?
16  A   I assume at Alamo Cafe with me.
17  Q   So the possible people at lunch are Officer Rodriguez,
18  Chavez, Gonzalez, and you; is that right?
19  A   Yes.
20  Q   Anyone else?
21  A   I -- I don't know exactly who was there.
22  Q   Because it looks like Rodriguez is alone.  So you just
23  were on your radio, put your radio away, and it looks like you
24  unmuted the mike; is that right?
25  A   The mike is being unmuted, muted, and unmuted, but I

Page 65

1    don't see me doing anything.  It could be in my pocket and doing
2    it on its own.  I don't know.  I don't see my hand going towards
3    the microphone, so it could be in my pocket and doing it itself.
4       Q    Was one officer assigned to securing the property and
5    the drugs that were in that vehicle?
6       A    One officer?
7       Q    Right.
8       A    One officer will eventually collect the evidence and --
9       Q    Did you know who that was going to be at this point?
10      A    No.  If I could hear the audio, maybe that's what we
11   were discussing, but I don't know.
12      Q    Why does that officer put gloves on --
13            MR. KOSANOVICH:  Objection; form.
14      Q    (BY MR. STEWARD:)  -- if you know?
15            MR. RALLS:  Same objection.
16            THE WITNESS:  I don't know.  So his hands don't
17   get evidence on it or whatever.
18      Q    (BY MR. STEWARD:)  Do you recognize the officer with
19   the K-9 unit?
20      A    Not yet.  Maybe keep playing.
21      Q    Does that help you identify?
22      A    That was Officer Trigo.
23      Q    Do you know, one way or the other, if the suspect was
24   still at the scene at 2:51?
25      A    I don't know.  I don't see him.

Page 66

1       Q    Who is that?
2       A    Detective Valdez.
3       Q    Was Detective Valdez involved in the apprehension of
4    the suspect?
5       A    No.
6       Q    Who contacted him?
7       A    He was already working the case.  I believe he was the
8    detective in charge.
9       Q    Do you recall speaking with him at the scene?
10      A    I'm sure I did.  I don't know what the conversation
11   would be.
12      Q    Up to this point -- and this is 3:07 -- have you seen
13   Gonzalez or Chavez?
14      A    No.
15      Q    Do you know if they ever came to this area?
16      A    I don't believe so.
17      Q    Where was the vehicle taken, if you know?
18      A    It would have been impounded.
19      Q    Who is the person that's walking towards the vehicle
20   right now?
21      A    He's a policeman.  I don't know his name, though.
22      Q    Would an officer have been assigned to drive the
23   vehicle to the impound yard?
24      A    No.  It would have been towed, or it could have been
25   released at the scene if the registered owner wasn't the suspect.

Page 67

1       Q    Did you ever determine if that vehicle was stolen?
2       A    No, it wasn't stolen.
3       Q    Do you have any idea what he is doing at this point?
4       A    He might be relocating it, getting it out of the way.
5    I don't know.
6       Q    And the footage endings in a few seconds.  It's
7    3:25:20.  Are you aware of any footage beyond that footage?
8       A    No.
9       Q    Are there any policies or procedures which indicate how
10   long or how much footage needs to be taken of a scene like this?
11      A    I don't think there's a time limit.
12      Q    When was the first time you saw that COBAN footage?
13      A    This is the first time I've seen all that footage.
14      Q    You hadn't seen the footage after he ditched the
15   vehicle; right?
16      A    Correct, yeah.
17      Q    Have you seen any photographs of the suspect after he
18   was taken into custody?
19      A    No.
20      Q    Do you know what his condition was when he was taken to
21   the hospital?
22      A    No.
23      Q    Do you believe that an officer has to determine if a
24   suspect is compliant or non-compliant before they determine the
25   amount of force to be used to apprehend that suspect?

Page 68

1            MR. KOSANOVICH:  Objection to form of the
2    question.
3            MR. RALLS:  Yeah.  Objection; vague, compound.
4            THE WITNESS:  Can you please repeat it?
5       Q    (BY MR. STEWARD:)  Sure.  Do you believe that an
6    officer has to determine if a suspect is compliant or
7    non-compliant before they determine the amount of force to be
8    used to apprehend that suspect?
9            MR. RALLS:  Objection; vague.
10           THE WITNESS:  Yes.
11      Q    (BY MR. STEWARD:)  Do you also believe that during any
12   stop and attempted apprehension the police officer must identify
13   themselves?
14           MR. RALLS:  Objection; vague, overly broad.
15           THE WITNESS:  Yes, and sometimes it's obvious.
16      Q    (BY MR. STEWARD:)  It's obvious certainly if they're
17   wearing a uniform?
18      A    Yes.
19      Q    It's not as obvious if they're not?
20      A    Correct.
21      Q    Based upon your training and experience, does the
22   San Antonio police officer, in 2014, secure the suspect before he
23   or she determines whether the suspect is compliant or not?
24           MR. RALLS:  Objection; overly broad and vague.
25           THE WITNESS:  I'm sorry, can you repeat that just

Page 69

1    one more time?
2        Q   (BY MR. STEWARD:)  Sure.  Based upon your training and
3    experience, in May of 2014, does a San Antonio police officer
4    secure the suspect before he or she determines whether the
5    suspect is compliant or not?
6        MR. RALLS:  Objection; overly broad and vague.
7        THE WITNESS:  They were -- hopefully, have a
8    compliant suspect when they place them under arrest or detain
9    them.  Is it okay if I use the restroom?
10       MR. RALLS:  Sure.
11       MR. STEWARD:  Sure.
12       THE VIDEOGRAPHER:  Time is 11:56 a.m.  We're off
13   the record.
14       (Recess taken)
15       THE VIDEOGRAPHER:  Time is 12:02 p.m.  We're back
16   on the record.
17       Q   (BY MR. STEWARD:)  Just a few more questions, Officer.
18   When you pulled into the parking lot at Rudy's, did you provide a
19   description of the suspect?
20       A   Yes.
21       Q   What was that description?
22       A   White shirt, blue jeans.
23       Q   Anything else?
24       A   No.
25       Q   Did you identify him as a Latin or Hispanic male?

Page 70

1        A   No.
2        Q   Was that information that was available to you?
3        A   No.  On that, I don't know.  I'd have to listen to
4    the -- the actual audio part of that to know if I said Latin male
5    or not.
6        Q   Well, backing up, did you have information through the
7    MDT as to the suspect's race and description?
8        A   No.  I don't believe DeLeon gave me his information.
9        Q   And you weren't able to look that up on a computer --
10       A   Correct.
11       Q   -- during the pursuit?
12       A   Correct.
13       Q   Did you ever look it up after?
14       A   Sure.
15       Q   When you typed in the report?
16       A   I'm sure, yeah.
17       Q   Okay.  Did you believe that the description of a white
18   suit (Sic) and blue jeans was sufficient for other police
19   officers to arrest the correct suspect?
20       MR. RALLS:  Objection; form.
21       MR. KOSANOVICH:  Objection; form.
22       MR. RALLS:  Yeah.
23       THE WITNESS:  You said --
24       MR. RALLS:  White suit you said, Brian.
25       MR. STEWARD:  Sorry.  White T-shirt and blue

Page 71

1    jeans.
2        Q   (BY MR. STEWARD:)  Did you believe that the description
3    of a white T-shirt and blue jeans was sufficient for the other
4    officers to arrest the correct suspect?
5        MR. KOSANOVICH:  Objection; form of the question.
6        THE WITNESS:  I gave the best description I could.
7        Q   (BY MR. STEWARD:)  Did you provide the other officers
8    with the name of the suspect?
9        A   No.
10       Q   Were you provided with the name of the suspect?
11       A   No.
12       Q   You were provided with a description of the Camry;
13   correct?
14       A   Yes.
15       Q   And you knew that this suspect was driving a gold
16   Camry?
17       A   Yes.
18       Q   Did you have a license plate for that Camry?
19       A   Are you talking about beforehand?
20       Q   Right.
21       A   No, I don't believe so.
22       Q   Do you know where the suspect was hiding when the
23   officers found him?
24       A   Yes.  I know where he was at.
25       Q   Do you know if any of the officers that found him drew

Page 72

1    their service revolvers?
2        A   I don't know.
3        Q   And just so I'm sure, you did not witness the struggle
4    between the suspect and those officers?
5        A   No.
6        Q   Where were you located?
7        A   On the parking lot.
8        Q   Right.
9        A   Yes.
10       Q   So you were actually -- you had asphalt under
11   your feet?
12       A   Yes.  I can elaborate a little bit further on.
13       Q   Sure, please.
14       A   Somebody in the parking lot, a civilian, had told me,
15   he just ran across to the woods.  So I ended up running towards
16   where he was at, but other officers had already found him.
17       Q   So after you get out of the vehicle you first go to the
18   Camry, secure the keys.  Then you turn around and you leave the
19   viewpoint of the COBAN system?
20       A   Uh-huh.
21       Q   At what point does this civilian tell you that they
22   just saw the suspect?
23       A   I believe, from the previous times I've seen it, it was
24   right after I go off the camera.
25       Q   And once the civilian tells you that, what do you do?

Page 73

```
 1       A   I would have to listen to the actual audio, but start
 2   going towards where he pointed to.
 3       Q   Did you see him hiding?
 4       A   At the time that person said it?
 5       Q   Right.
 6       A   No, no.
 7       Q   At some point afterwards, did you see him hiding?
 8       A   When -- I ended up making the scene of the arrest, yes.
 9       Q   So was he hiding in the woods?
10       A   Yes.
11       Q   How far into the woods?
12           MR. KOSANOVICH:  Objection; calls for speculation.
13           THE WITNESS:  Yeah.  About 10, 15 yards from the
14   access road into the woods, maybe 20 yards.
15       Q   (BY MR. STEWARD:)  So the distance where he was located
16   was 10 to 15 yards from the access road?
17       A   Correct.
18       Q   How far was it from the parking lot?
19       A   From the end of the parking lot?
20       Q   Right.
21       A   30, 40 yards, maybe.
22       Q   From that location, could you see the fire department?
23       A   No.
24       Q   Have you ever evaluated another officer for their use
25   of force?
```

Page 74

```
 1       A   No.
 2       Q   Have you ever been investigated by internal affairs?
 3       A   Yes.
 4       Q   When?
 5       A   Earlier in my career.  I don't know exactly when.
 6       Q   Generally, for what?
 7       A   I've had a few use of force complaints.
 8       Q   And the last use of force complaint against you would
 9   have been approximately when?
10       A   More than 10 years ago.  I haven't been complained on
11   since I got on patrol -- prior to SWAT.
12       Q   So prior to SWAT?
13       A   Prior to SWAT, yeah.
14       Q   Okay.  Let me state it a different way.  Since you've
15   been with SWAT, there have not been any use of force complaints
16   made against you?
17       A   Correct.
18       Q   And as such, internal affairs has not investigated you
19   for any use of force complaints since 2006?
20       A   Correct.
21       Q   Prior to 2006, there were two use of force complaints
22   made against you?
23       A   I believe three.
24       Q   Three use of force complaints made against you, and do
25   you remember the facts or circumstances of those complaints?
```

Page 75

```
 1       A   None in great detail, but they were found --
 2       Q   What do you remember?
 3       A   -- they were found -- well, I don't know how you -- not
 4   guilty or inconclusive, whatever you want to call it.
 5       Q   Were they dismissed?
 6       A   I don't know if that's considered like a judgment, but
 7   it's either, I think, inconclusive or something else or in --
 8           MR. RALLS:  Unfounded.
 9           THE WITNESS:  Unfounded.  There you go.
10   Unfounded.
11       Q   (BY MR. STEWARD:)  So they never made it the chief's
12   Advisory Action Board?
13       A   No, I was --
14           MR. KOSANOVICH:  Objection; form.
15           THE WITNESS:  -- I was found not to have committed
16   the violation.
17       Q   (BY MR. STEWARD:)  Was a statement taken from you?
18       A   I'm sure, yes.
19       Q   And were you asked about the facts and circumstances of
20   your involvement with the complainant?
21       A   Of those cases?
22       Q   Right.
23       A   Yes.
24       Q   Were you involved or contacted by internal affairs with
25   respect to the investigation of Chavez, Gonzalez, and Detective
```

Page 76

```
 1   John Doe?
 2       A   No.
 3       Q   Were you aware of an internal affairs investigation
 4   into those officers?
 5       A   I knew they went to internal affairs, yes.
 6       Q   In your internal affairs investigation, after your
 7   statement, were you asked specifically if you believe that the
 8   charges were well founded?
 9           MR. KOSANOVICH:  Objection to form of the
10   question.
11           THE WITNESS:  I don't know.  Which case are you
12   referring to?
13       Q   (BY MR. STEWARD:)  Any of the three.
14       A   Of my cases?
15       Q   Right.  Okay.
16       A   Okay.  Repeat your question again.
17       Q   Sure.  With respect to the complaints that were made --
18       A   Against me.
19       Q   -- against you --
20       A   Uh-huh.
21       Q   -- did you believe that the complaints were valid?
22       A   No.
23       Q   And certainly you wouldn't have agreed to any
24   suspensions, based upon what the complainant says, with respect
25   to the complaints that were made against you?
```

Page 77

```
 1        A   I can't say that.
 2        Q   Well, if you didn't -- if you didn't believe that you
 3   had done anything wrong, you certainly would have -- wouldn't
 4   have agreed with the recommendation from the Chief that you be
 5   suspended for five, 10, or 15 days?
 6        MR. RALLS:  Objection; calls for speculation.
 7        THE WITNESS:  No.  Some of those decisions are
 8   made financially.  You can't afford to be suspended from what
 9   you're being told so you're given an offer, and financially you
10   have to make decisions based on your family, and sometimes you
11   have to swallow a pill and take what is given to you.
12        Q   (BY MR. STEWARD:)  So it may not be a matter of whether
13   you think it's valid or not, from a financial standpoint, you, as
14   the officer, may feel that you don't have an alternative?
15        A   Correct.
16        Q   And you don't know, one way or the other, if that is
17   why Officer Chavez or Gonzalez or Detective John Doe agreed to
18   suspensions from the Chief, do you?
19        A   I don't know why they -- what -- if they did what they
20   did.  I don't know.
21        Q   Did you ever have a conversation with the suspect after
22   he was taken into custody?
23        A   The suspect that I was chasing?
24        Q   Right.
25        A   I don't believe so.
```

Page 78

```
 1        Q   At the point where the suspect you were chasing was
 2   taken into custody, there were no other suspects, were there?
 3        A   He was by himself.
 4        Q   But once he was taken into custody, the individual that
 5   you were pursuing was no longer a risk to anyone else?
 6        A   I'm sorry.  Can you repeat that again, please?
 7        Q   At the time he was taken into custody, your police
 8   report says 1430, or 2:30, there were no other suspects that were
 9   being pursued with respect to what you had been told on your cell
10   phone --
11        A   Correct.  That's correct.
12        MR. RALLS:  Be sure and let him -- I know you're
13   asking him to repeat some questions, but when he does, make sure
14   you wait until he finishes his question.
15        THE WITNESS:  I'm sorry.
16        Q   (BY MR. STEWARD:)  Do you know what the suspect's
17   condition was such that he had to be taken to the hospital?
18        A   No, I don't know what his condition was.
19        Q   Are you aware of any photographs of the suspect which
20   were taken at the scene?
21        A   No.
22        Q   Was EMS called for the suspect?
23        A   I don't know.
24        Q   Was EMS called for any of the officers who assisted in
25   the apprehension of the suspect?
```

Page 79

```
 1        A   Not that I know of.
 2        Q   Did you receive any injuries?
 3        A   No.  It says that EMS made the location and treated the
 4   AP, so EMS was called for the suspect we were chasing.
 5        Q   Did you actually see EMS treating the suspect?
 6        A   Not that I remember.
 7        Q   Do you know what the results of the X-rays at the Brady
 8   Green for the suspect were?
 9        A   No.
10        MR. STEWARD:  I'll pass the Witness.
11        MR. KOSANOVICH:  We'll reserve all our questions
12   until the time of trial.
13        MR. RALLS:  I'll reserve mine until trial.
14        THE VIDEOGRAPHER:  Time is 12:14 p.m.  We are off
15   the record.
16        (Proceedings concluded.)
17
18
19
20
21
22
23
24
25
```

Page 80

```
 1            CHANGES AND SIGNATURE
 2   WITNESS NAME: JAMES YBARRA
 3   DATE OF DEPOSITION: JANUARY 31, 2017
 4   PAGE  LINE      CORRECTION AND REASON
 5   ____ ____ _____
     ____ ____ _____
 6   ____ ____ _____
     ____ ____ _____
 7   ____ ____ _____
     ____ ____ _____
 8   ____ ____ _____
     ____ ____ _____
 9   ____ ____ _____
     ____ ____ _____
10   ____ ____ _____
     ____ ____ _____
11   ____ ____ _____
12   IF YOU DO NOT WISH TO MAKE ANY CHANGES, PLEASE NOTE "NONE" ABOVE.
13        I, JAMES YBARRA, have read the foregoing deposition and
     hereby affix my signature that same is true and correct, except
14   as noted above.
15
                 _____
16                   JAMES YBARRA
     THE STATE OF TEXAS  )
17   COUNTY OF_____  )
18        Before me,_____, on this day
     personally appeared JAMES YBARRA, known to me (or proved to me
19   under oath or through _____) (description of identity
     card or other document) to be the person whose name is subscribed
20   to the foregoing instrument and acknowledged to me that they
     executed the same for the purposes and consideration therein
21   expressed.
          Given under my hand and seal of office this _____ day
22   of _____, 20___.
23
                 Notary Public in and for
24               the State of _____
25   My commission expires: _____
```

Page 81

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE WESTERN DISTRICT OF TEXAS
                       SAN ANTONIO DIVISION
 3    ROGELIO CARLOS, III AND        *
      MYRNA CARLOS                   *
 4                                   *
      VS.                            *  CIVIL ACTION
 5                                   *  NO. 5:16-CV-00251-FB
                                     *
 6    CARLOS CHAVEZ, VIRGILIO        *
      GONZALEZ, JAMES YBARRA, MARK   *
 7    DELGADO, CITY OF SAN ANTONIO,  *
      SAN ANTONIO POLICE DEPARTMENT  *
 8    AND DETECTIVE JOHN DOE         *
 9    ----------------------------------------------------
10                  REPORTER'S CERTIFICATE
11                DEPOSITION OF JAMES YBARRA
12                     JANUARY 31, 2017
13    ----------------------------------------------------
14            I, DARLENE ZUEHL, a Certified Shorthand Reporter in and
15    for the State of Texas, do hereby certify that the foregoing
16    deposition is a full, true and correct transcript;
17            That the Witness, JAMES YBARRA, was duly sworn by the
18    officer and that the transcript of the oral deposition is a true
19    record of the testimony given by the Witness;
20            That the deposition transcript was submitted on
21    _____ ____, 2017, to the witness or to the attorney for
22    the witness for examination, signature and returned to me by
23    _____ ____, 2017;
24            That the amount of time used by each party at the
25    deposition is as follows:
```

Page 82

```
 1            Brian C. Steward - (1 hour, 50 minutes)
 2            That pursuant to information given to the deposition
 3    officer at the time said testimony was taken, the following
 4    includes counsel for all parties of record:
 5            Brian C. Steward, Phillip G. Bernal, Kris Hufstetler,
 6    Attorneys for Plaintiffs;
 7            N. Mark Ralls, Attorney for Defendants;
 8            Mark Kosanovich, Attorney for Defendants.
 9            I further certify that I am neither counsel for,
10    related to, nor employed by any of the parties or attorneys in
11    the action in which this proceeding was taken, and further that I
12    am not financially or otherwise interested in the outcome of the
13    action.
14            Certified to by me this ___ day of _____, 20___.
15
16            _____
              DARLENE ZUEHL, Texas CSR #7505
17            Expiration Date:  December 31, 2018
              REPUBLIC SERVICES, INC.
18            12108 Radium Street
              San Antonio, Texas  78216
19            (210) 298-6300   Firm Reg. #649
20
21
22
23
24
25
```

Page 83

```
 1                  FURTHER CERTIFICATION
 2            The original deposition transcript with corrections ( )
 3    was ( ) was not returned pursuant to the Rules, and the ( )
 4    original transcript ( ) copy of nonsignature certificate to be
 5    attached to the attorney's copy of the deposition was mailed by
 6    UPS to the custodial attorney, Brian C. Steward, for safekeeping
 7    and use at trial.
 8            If returned, the attached Changes and Signature page
 9    contains any changes and the reasons therefor;
10            That $_____ is the deposition officer's charges to
11    Brian C. Steward for preparing the original deposition transcript
12    and any copies of exhibits;
13            That the deposition was delivered in accordance with
14    the Federal Rules of Civil Procedure, and that a copy of this
15    certificate was served on all parties shown herein on and filed
16    with the Clerk.
17            Certified by me this ___ day of _____, 20___.
18
19
20            _____
              DARLENE ZUEHL, Texas CSR #7505
21            Expiration Date:  December 31, 2018
              REPUBLIC SERVICES, INC.
22            12108 Radium Street
              San Antonio, Texas  78216
23            (210) 298-6300   Firm Reg. #649
24                  ORIGINAL NOT VALID
25                  UNLESS SIGNED BY REPORTER
```