IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ROGELIO CARLOS III, MYRNA CARLOS,<br><br>*Plaintiffs*,<br><br>vs.<br><br>CARLOS CHAVEZ, VIRGILIO GONZALEZ, JAMES YBARRA, MARK DELGADO, CITY OF SAN ANTONIO, SAN ANTONIO POLICE DEPARTMENT, DETECTIVE JOHN DOE, WILLIAM VANNESS,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§   5-16-CV-00251-FB-RBF<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns three motions: (1) the Motion for Summary Judgment filed by Defendant William VanNess, M.D., Dkt. No. 201; (2) the Motion for Summary Judgment filed by Defendants Carlos Chavez, Virgilio Gonzalez, James Ybarra, Mark Delgado and Detective John Doe, Dkt. No. 202; and (3) the Motion to Dismiss and/or Motion for Summary Judgment filed by Defendant City of San Antonio, Dkt. No. 206. All pretrial matters in this action were referred for resolution pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 82. The Court has jurisdiction over this § 1983 action, *see* 28 U.S.C. § 1331, and authority to enter this recommendation derives from 28 U.S.C. § 636(b)(1)(B).

Plaintiff Rogelio Carlos, III was paralyzed following surgery performed to address injuries he allegedly sustained during his arrest on May 20, 2014. In this action, Carlos and his

1

wife raise Fourth Amendment claims, via §1983, against the City of San Antonio and members of the San Antonio Police Department ("SAPD"). Dkt. No. 60 (3d Am. Complaint). Although one of the SAPD members is a detective and the others are SAPD officers, this Report and Recommendation will occasionally refer to them all collectively as the "officers." The Carloses also bring negligence claims against the companies, technician, and physician who provided neuromonitoring services during his surgery. At this stage of the litigation, however, the only remaining negligence and gross-negligence claims are those asserted against Dr. VanNess, the neuromonitoring physician.

The Court held a hearing on October 11, 2019, to address the motions currently at issue, and all parties appeared through counsel of record. Counsel for the Carloses conceded at the hearing that the only remaining claims they now wish to pursue against the City and Officers Chavez, Gonzalez, Ybarra, and Doe are for unlawful arrest and excessive force. The Carloses' counsel also conceded that Plaintiffs don't have a valid claim against Officer Delgado in his individual capacity.

In light of these concessions at the hearing and the reasons discussed below, I recommend the following:

(1) Dr. VanNess' Motion for Summary Judgment, Dkt. No. 201, should be **GRANTED.** The Carloses lack reliable evidence to show causation, which is a necessary element of all claims against VanNess that are at issue.

(2) The individual SAPD officers' Motion for Summary Judgment, Dkt. No. 202, should be **GRANTED** in part and **DENIED** in part. The excessive-force claims against individual Officers Chavez and Gonzalez and Detective Doe involve triable fact issues and should proceed. But the unlawful-arrest claims should all be dismissed.

>Plaintiffs concede they have no claim against Officer Delgado and, in any event, all of the individual Defendants enjoy qualified immunity on the unlawful-arrest claims.

(3) The City's Motion for Summary Judgment, Dkt. 206, should be **GRANTED**.

I.  **Factual and Procedural Background**

This action stems from the May 20, 2014 mistaken arrest of Carlos by Detective Doe and Officers Chavez and Gonzalez. *See* Dkt. 269 at 2, 14-5, 17-8 (Supp. Briefing). On that day, the police had a valid arrest warrant for a man named Josue Gonzalez-Rodriguez, who they wanted to apprehend for a felony family-violence charge. *See id.* at 2. Assisting with a narcotics investigation at the time, Doe wore plain clothes and drove an unmarked truck when he contacted Officer Ybarra for assistance on May 20 with a traffic stop of Gonzalez-Rodriguez. *See id.* at 4, 7, 14. But when Ybarra tried to stop Gonzalez-Rodriguez's car, Gonzalez-Rodriguez led Ybarra on a vehicle chase that ended in a restaurant parking lot. *See id.* at 2. There, Gonzalez-Rodriguez abandoned his vehicle and fled on foot. *See id*. Ybarra radioed that Gonzalez-Rodriguez had fled on foot into a wooded area north and behind the restaurant, and Ybarra described Gonzalez-Rodriguez as wearing a white T-shirt and blue jeans. *See id*. at 2, 5, 6, 8, 11.

Detective Doe and Officers Chavez and Gonzalez also participated in the pursuit of Gonzalez-Rodriguez. *See id*. at 5-6, 8-12. They knew Gonzalez-Rodriguez had an outstanding felony arrest warrant coupled with a history of violence, and they also knew that Gonzalez-Rodriguez had fled from Officer Ybarra in a vehicle for a while and then on foot. *See id.* at 2, 4, 8, 10. Searching for Gonzalez-Rodriguez, Doe spotted Carlos standing in a wooded area next to a construction site in the general vicinity of the restaurant where Ybarra last saw Gonzalez-Rodriguez. *See id*. at 6, 14. Innocently taking pictures of a construction site on property he owned with his wife and her sister, Carlos, in a stroke of terrible misfortune, wore that day a

3

white T-shirt and dark blue cargo shorts. *See id*. at 2, 3; Dk. No. 236 at 89-90. Believing that Carlos matched the description of the fleeing Gonzalez-Rodriguez, Doe approached Carlos. *See* Dkt. 269 at 14-5. What happened next is in dispute, although there is no question that Carlos did not try to flee. *Id*. at 2.

Although the evidence concerning events after Detective Doe spotted Carlos is conflicting, the Carloses' version takes precedence at this stage in the litigation.[1] According to the Carloses, Doe drove his truck towards Carlos at a high rate of speed, slammed on the brakes, and jumped out of the truck saying, "get on the ground." *See* Dkt. 236 at 96. After Doe told him to "get on the ground" a second time, Carlos began crouching down towards the ground, but turned slightly to the left as he again heard, "get on the ground" from a second source; Officers Chavez and Gonzalez were now approaching on foot after leaving their vehicle. *See id*. at 93-4. As Carlos turned back to Doe, he says, Doe hit him across the head with an object of some kind. *See id*. at 94-5. At that point, according to Carlos, he went down to the ground, and the officers began punching him; one of them kicked him in the face, and Officer Gonzalez put his knee on Carlos's head and jumped up and down repeatedly. *See id*. at 98-9. According to Carlos, as he tried to explain that his wife and her sister owned the property, Doe told him to "shut the fuck up" and elbowed him on the side of the head multiple times. *See id*. at 99-100. After handcuffing Carlos, the officers learned that others had apprehended Gonzalez-Rodriguez in a nearby location, and the officers at that point realized their mistake and released Carlos. *See id*. at 110-11.

Carlos subsequently complained to the Internal Affairs Unit of the SAPD, which investigated the officers' use of force. *See* Ex. F to Dkt. 206 at 2-3. The Complaint and

---

[1] *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (noting that when evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

Administrative Review Board ("CARB"), which consists of both sworn SAPD members and civilian appointees, took up matters upon completion of the Internal Affairs investigation. *See id.* at 3. The CARB members voted on whether the officers violated SAPD use-of-force procedure 501.05B and recommended corrective action. *See id.* San Antonio's Chief of Police, William P. McManus, reviewed the CARB's non-binding, advisory recommendations and issued each of the officers a contemplated 15-day suspension, which represented the level of discipline the Chief was contemplating as he prepared to meet with them at a later date. *See id.* But in November 2014, after meeting with Detective Doe and Officers Chavez and Gonzalez, and reviewing their disciplinary history, Chief McManus officially determined they had violated SAPD Procedure 501.05(B), suspended each for 5 days, and ordered each to attend additional training at the SAPD Training Academy. *See id.* at 3-4, 9-17. The officers did not attend the required additional training until March 6, 2017. *See id.* at 4.

Meanwhile, Carlos experienced tenderness in his neck and numbness in his arm following his arrest, and he eventually sought treatment from spinal surgeon Dr. Adam Bruggeman. *See* Ex. A to Dkt. No. 201 at 3-4. Dr. Bruggeman, who is not a party to this action, recommended surgery for Carlos, and he performed that surgery on November 3, 2015. *See id.* at 8-10. It is undisputed that during the surgery, Carlos's C7 vertebra fractured and a bone fragment from the fracture compressed his spinal cord and caused his paralysis. *See id.* at 35. Dr. VanNess acted as a neuromonitoring physician during the surgery, remotely observing and interpreting Carlos's neurological signals during the procedure. *See* Ex. B to Dkt. No. 201 at 11-12.

On March 10, 2016, the Carloses sued the City of San Antonio as well as the SAPD officers in their individual capacities. The Carloses alleged Fourth and Fourteenth Amendment violations, and that the officers' actions were the result of policies or customs of the SAPD, as well as a result of inadequate training or supervision. *See* Dkt. No. 60 at 10-16. The Carloses

lodged state law claims for negligence and gross negligence against the neuromonitoring companies and technician, as well as Dr. VanNess. *See id*. at 19-25. As to Dr. VanNess, the only remaining defendant on these negligence claims, the Carloses claim VanNess caused Mr. Carlos's paralysis by failing to timely communicate information necessary to discover that the bone fragment was compressing his spine. *See* Dkt. No. 231 at 9-10.

## II.     Legal Standards

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to show genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The nonmovant must respond to the motion by setting forth particular facts indicating that there is a genuine issue of disputed fact. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The Court views the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."

*Westphal*, 230 F.3d at 174. If, however, the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

### III.   Analysis

A.   *No Evidence of Causation for Claims Against Dr. VanNess.* Causation is an essential element of the negligence and gross-negligence claims against Dr. VanNess. *McManaway v. KBR, Inc.*, 852 F.3d 444, 451 (5th Cir. 2017). Indeed, gross-negligence and negligence claims require evidence of a "reasonable medical probability" that the negligence of the defendant caused the plaintiff's injury, which is to say evidence that it is "more likely than not" that the ultimate harm resulted from such negligence. *Young v. Mem'l Hermann Hosp. Sys.*, 573 F.3d 233, 235 (5th Cir. 2009) (quoting *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399-400 (Tex.1993)). It has long been the general rule in Texas that expert testimony is necessary to establish causation as to medical conditions that are not within the common knowledge and experience of the fact finder. *Johnson v. Arkena, Inc.*, 685 F.3d 452, 470 (5th Cir. 2012) (citing *Guevara v. Ferrer*, 247 S.W.3d 662, 665-66 (Tex. 2007)).

Dr. VanNess is entitled to summary judgment on the negligence and gross-negligence claims because this Court's Order on August 27, 2019, struck Carlos's proposed expert testimony on causation. *See* Dkt. No. 252. Carlos filed objections to the Order excluding his causation experts' testimony, and those objections remain pending before the District Judge. Assuming the District Judge rejects those objections or otherwise agrees that the causation opinions of the experts, Dr. Yingling and Dr. Sclabassi, should be excluded, those claims must fail.

No one contests that expert testimony on causation is needed here. Indeed, at the October 11 hearing, counsel for the Carloses conceded on the record that an expert opinion from a physician is required to prove the causation element of the Carloses' claims against VanNess. Counsel for the Carloses further conceded that if the District Judge overrules the objections to the Order striking the expert testimony on causation, then summary judgment for VanNess is proper. The Carloses have not proffered any other experts on causation as to claims against Dr. VanNess.

For these reasons, Dr. VanNess's Motion for Summary Judgment, Dkt. No. 201, should be **GRANTED**.

  *B.*   *The Parties' Concessions Narrow the Litigation.* The October 11 hearing clarified matters considerably, at least in terms of understanding what claims against which Defendants are viable and remain at issue in the litigation. As already mentioned, Plaintiffs' counsel stated on the record at the October 11 hearing that no claims against Officer Delgado will be pursued any further. At issue, therefore, are claims for: (1) excessive force against Officers Chavez and Gonzalez as well as Detective Doe; and (2) unlawful arrest against Officers Chavez, Gonzalez, and Ybarra and also against Detective Doe. Plaintiffs pursue no other claims against the individual Defendants. Moreover, counsel for the individual Defendants acknowledged at the hearing that the excessive-force claims are not amenable to summary judgment. The individual Defendants' request for summary judgment on the excessive-force claims, therefore, should be denied.

In sum—based on the parties' concessions at the October 11 hearing—summary judgment for Officer Delgado should be granted and all claims against him should be dismissed. The motion for summary judgment of Officers Chavez and Gonzalez and Detective Doe should be denied as to the claim for excessive force. Remaining to be addressed are claims against the

individual Defendants for unlawful arrest in violation of the Fourth Amendment. As discussed next, the individual Defendants are entitled to summary judgment on these claims because they enjoy qualified immunity.

  C.  *The Unlawful-Arrest Claims Cannot Overcome Qualified Immunity.* The doctrine of qualified immunity "shields government officials performing discretionary functions from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994) (quotation marks omitted); *see Pearson v. Callahan*, 555 U.S. 223, 233-36 (2009). Once qualified immunity is properly raised, as the individual Defendants have done here, the plaintiff bears the burden of negating it, even on summary judgment. *E.g.*, *Griggs v. Brewer*, 841 F.3d 308, 312-13 (5th Cir. 2016). To negate qualified immunity on summary judgment, the undisputed facts and the disputed facts viewed in the plaintiff's favor must first reflect the violation of a clearly established constitutional right. *Id*. at 257-58. The plaintiff also must demonstrate that the officer's conduct was objectively unreasonable under the law at the time of the incident. *Id*. at 258; *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks omitted). Here, Plaintiffs fail to carry their burden with respect to the unlawful-arrest claims against the individual Defendants.

  "[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 902 (1971) (internal quotations marks omitted). Here, officers had a valid arrest warrant and probable cause to arrest Gonzalez-Rodriguez. *See* Dkt. No. 269 at 2, 4, 14. At issue, therefore, is the reasonableness of the mistaken arrest of Carlos. *See Blackwell*

*v. Barton*, 34 F.3d 298, 303-04 (5th Cir. 1994). The relevant question is whether a reasonable officer in the position of Officer Chavez, Officer Gonzalez, or Detective Doe could believe there was reasonable cause to think Carlos was the wanted person. *Id*. at 303. Here, a reasonable officer in any of these officers' positions, especially given the exigencies of the sitaution, could believe there was reasonable cause think Carlos was Gonzalez-Rodriguez.

Every officer involved in the arrest knew that Gonzalez-Rodriguez, a Hispanic male, had an outstanding warrant for felony assault/family violence and that he refused to stop and instead fled in his vehicle when Officer Ybarra attempted a traffic stop. *See* Dkt. No. 269 at 2, 5, 14. Every officer involved also knew that the vehicle chase ended in the restaurant's parking lot, where Gonzalez-Rodriguez abandoned his vehicle and fled on foot into a nearby wooded area to the north and behind the restaurant. *See id*. at 2, 5, 14. Every officer received Ybarra's description of the suspect wearing a white T-shirt and blue jeans, although Doe seems to contend that he only heard the description as white t-shirt over blue. *See id*. at 2, 5, 8, 11, 14. That desctiption, although hardly complete or as thorough as it might have been, was not objectively unreasonable in the fast-evolving circumstances of an ongoing, dangerous pursuit of a potentially dangerous suspect. For the officers receiving Ybarra's description, it bears noting that probable cause "can rest upon the collective knowledge of the police when there is communication between them." *United States v. Walker*, 960 F.2d 409, 416 (5th Cir. 1992). Officers searching for Gonzalez-Rodriguez were therefore looking for a possibly dangerous Hispanic male taking cover in the woods in a relatively small geographic area and wearing a white t-shirt and jeans or blue pants of some sort. Any reasonable officer spotting someone fitting into most of those parameters, or upon seeing a fellow officer approaching such a person, would reasonably believe that there was a very limited amount of time in which to safely take that person into custody.

Here, as Doe assisted with the search, he saw Carlos standing in the wooded area next to a construction site in the general vicinity of the restaurant where Gonzalez-Rodriguez fled, and so Doe approached Carlos. *See id.* at 6, 14. That Carlos was not in the woods to the north of the restaurant but was to the east of it can't make Doe's actions objectively unreasonable. It was indisputably the same general area. Meanwhile, Chavez and Gonzalez stood by their patrol car parked on the road near the wooded area and the construction site when they saw Carlos in the wooded area and noted Doe approaching him. *See id.* at 9-10, 12, 16, 17. Under these circumstances and assessing the objective reasonableness of each officer's actions separately, the arrest was not an unconsitutional unlawful arrest. Carlos's arrest was instead an objectively reasonable, albeit tragic, mistake. *See Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) ("We must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison."). It's helpful to keep in mind that in the seminal *Hill v. California*, a mistaken arrest was deemed objectively reasonable even though the arrestee provided officers with identification bearing a name other than the suspect's. 401 U.S. at 802-04. Events here were more quickly evolving, and they occured in the context of an ongoing pursuit of a dangerous suspect. *See id.* at 804 ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.").

  D.  *The City's Motion for Summary Judgment*. Next is the City's motion for summary judgment or to dismiss. Because summary judgment for the City is warranted, any arguments for dismissal distinct from the summary judgment arguments—to the extent there are any such dismissal arguments presented—need not be addressed.

The City's motion for summary judgment invokes the familiar notion that a municipality cannot be held liable via § 1983 for the actions of its employees, such as the officers in this case, on any theory of vicarious or *respondeat superior* liability. *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Id*. at 694. In other words, municipal liability arises "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989) (emphasis in original). Within this framework, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694). Moreover, at issue here is potential municipal liability only on the excessive-force claims—the unlawful-arrest claims aren't premised on an actionable constitutional violation, as discussed above, so there can be no municipal liability on those claims.

Before proceeding further in the analysis, Plaintiffs' theory of municipal liability should be clarified. Plaintiffs apparently premise municipal liability on an alleged custom or practice of SAPD officers employing excessive force or engaging in unlawful arrests resulting from a failure to train or supervise, as evidenced by the officers' alleged actions in this case. Plaintiffs further urge that the City effectively ratified this custom or practice by failing to sufficiently discipline officers in the wake of Carlos's arrest. Plaintiffs also invoke an alleged custom or policy of poor communication with arresting officers, but any such theory couldn't support liability here because it would only pertain to unlawful-arrest claims and, as discussed above, there was no unconstitutional arrest here.

1.  **Single Incident.** No matter how Plaintiffs' theory is presented—whether as a failure to train, a failure to supervise, or a ratified single incident—that theory is based on a single incident: Carlos's arrest. Allegations of an isolated incident are generally insufficient to establish a policy or custom for purposes of municipal liability. *Friaire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). Such is the case here.

A failure to train or supervise theory requires proof that: (1) the official either failed to supervise or train the officer (2) there is a causal link between such failure and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference to the plaintiff's constitutional rights. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. Inept, erroneous, ineffective, or negligent actions don't amount to deliberate indifference, which requires more than negligence or even gross negligence. *Id*. To show deliberate indifference, the plaintiff must typically demonstrate a pattern of violations and that the inadequacy of the training was "obvious and obviously likely to result in a constitutional violation." *Id*. (quotations omitted). But, as mentioned, this case involves only a single incident.

There can be no municipal liability for a failure to train if the officers' training meets the standards required by Texas law, unless the plaintiff shows that the legal minimum of training was insufficient. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010); *Gonzalez v. Westbrook*, 118 F.Supp.2d 728, 737 (W.D. Tex. 2000). Here it is undisputed that the training provided by the SAPD to the officers involved exceeded the State's minimum standards. *See* Ex. G. to Dkt. No. 206.

Moreover, the SAPD's investigation concluded that the officers violated the SAPD's use-of-force policy, making this an example of a single incident involving a deviation from the

SAPD's established policies and training. In most single-incident cases, the policymaker must have provided *no training* at all in order to establish municipal liability for failure to train. *Littell v. Houston Ind. School Dist.*, 894 F.3d 616, 624-5 (5th Cir. 2018). Plaintiffs point to no evidence of other similar incidents, much less a pattern of any such violations.[2] Accordingly, this single incident is insufficient to raise a genuine issue of material fact regarding whether any failure to train or supervise on the part of the City amounted to deliberate indifference to Carlos's constitutional rights. *See DeShay v. Bastrop Indep. Sch. Dist.,* 180 F.3d 262 (5th Cir.1999) (affirming the district court's determination that summary judgment evidence showing at most an isolated incident was not actionable under § 1983).

        **2.**     **Ratification.** Plaintiffs also pursue a route to municipal liability involving so-called ratification. If "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). But a ratification theory of municipal liability typically applies only in egregious situations in which policymakers did nothing to discipline officers or change policies in the wake of dramatic violations by officers. *See, e.g.*, *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985). According to Carlos, the City ratified the officers' conduct here because although the SAPD determined that the officers' use of force violated the SAPD's policy, the discipline imposed on the officers as a result was superficial, had no negative effect, and was not fully enforced until after this litigation began. *See* Dkt. No. 234 at 27-33. The scenario presented here, even viewing all disputed facts and drawing all

---

[2] In their response, Plaintiffs claim that excessive force was also used against the real suspect (Gonzalez-Rodriguez) during his arrest. But the only support offered for that contention is a police report that reflects the suspect actively resisted arrest and required some medical attention after his arrest. *See* Dkt. No. 234 at 17. Plaintiffs offer no competent evidence that a complaint was filed or investigation conducted with regard to Gonzalez-Rodriguez's arrest, and this unsupported argument does not demonstrate a similar incident or establish a pattern.

reasonable inferences in Plaintiffs' favor, cannot support a ratification theory of municipal liability.

For one, the facts of this case don't rise to the extreme level typically seen as capable of demonstrating an unconstitutional policy or deliberate indifference on the part of the City through ratification.[3] The *Grandstaff* case illustrates this point. There, police were engaged in a high-speed chase involving gunfire. *Grandstaff*, 767 F.2d at 165. When the suspect stopped and fled his vehicle, there was a second round of gunfire. *Id*. Meanwhile, Grandstaff awoke due to the noise and drove towards the officers to assist them. But when he did, police opened fire on his vehicle from two sides. *Id*. And when Grandstaff managed to exit his vehicle, he was shot in the back with a high-powered rifle. *Id*. The Court imposed municipal liability, concluding that the city's total failure to admit error, reprimand or discharge the officers, or change its policies was evidence of a policy of reckless disregard for human life. *Id*. at 171.

Here, in contrast to *Grandstaff*, the force used by the SAPD officers—although extremely rough as Carlos describes things—is nothing like the deadly force used in *Grandstaff*. There's also no dispute that here, unlike in *Grandstaff*, the SAPD conducted an investigation, found a breach of policy by the officers, issued suspensions to the officers, and eventually required additional training. And the fact that the additional training wasn't completed until several years after the incident—although troubling—isn't enough to find ratification.

For these reasons, the City's Motion to Dismiss and/or Motion for Summary Judgment should be **GRANTED**.

---

[3] *See Westfall v. Luna*, 903 F.3d 534, 552 (5th Cir. 2018) (refusing to find ratification based on a single incident of an officer body-slamming the plaintiff which resulted in back injuries where there was no evidence of deliberate indifference on the part of the city); *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998) (declining to find ratification of the city where the plaintiff was shot in the back by police as he was fleeing because such facts did not rise to the level of extraordinary circumstances required by *Grandstaff*).

### IV.  Objections

VanNess and the SAPD officers lodge various objections to certain pieces of summary judgment evidence. *See* Dkt. Nos. 243 at 1 and 245 at 2-4. Because none of the objections, even if granted, would materially affect the analysis on the motions for summary judgement, the objections need not be addressed.

### V.  Conclusion and Recommendation

For the reasons discussed above, it is recommended that VanNess' Motion, Dkt. No. 201, be **GRANTED**; the SAPD Officers' Motion, Dkt. No. 202, should be **GRANTED** in part and **DENIED** in part; and the City's Motion, Dkt. 206, should be **GRANTED**. The objections to summary judgment evidence asserted by Defendants VanNess and Officers Chavez, Gonzalez, Ybarra, and Detective Doe should be overruled.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party shall file the objections with the clerk of the court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*,

474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 21st day of February, 2020.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE